**GITS MANUFACTURING COMPANY, L.L.C., Plaintiff,**

v.

**LOCAL 281 INTERNATIONAL UNION, United Automobile, Aerospace, and Agricultural Implement Workers of America, and Its Affiliated Local Union Number 1946, and Sheila Mickey, Defendants.**

No. 4:02–CV–40243..

United States District Court,
S.D. Iowa,
Central Division.

May 7, 2003.

Gene R. Lasuer, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiff.

Mark T. Hedberg, Hedberg Owens & Hedberg, Des Moines, IA, for Defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

Before the Court are cross-motions for summary judgment filed by the parties. This matter came on for hearing on February 28, 2003, with Gene R. LaSuer appearing on behalf of GITS Manufacturing Company, L.L.C. ("GITS"), and Mark T. Hedberg appearing on behalf of Local 281 International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, and its affiliated Local Union Number 1946 ("the Union"), and Defendant Sheila Mickey ("Mickey"). For the reasons discussed herein, the Union's Motion for Summary Judgment (Clerk's No. 15) is **GRANTED**, and the GITS Motion for Summary Judgment (Clerk's No. 7) is **DENIED**.

### *SUMMARY OF MATERIAL FACTS*

GITS is an automotive sub-assembler in Creston, Iowa. The Union represents the employees of GITS. Mickey was an employee with GITS, working in a variety of capacities at GITS since beginning in 1989, and was employed as an assembler in May of 2001. On occasion, Mickey's job required her to go to the receiving area of the plant. According to the supervisor of the receiving area when Mickey was there, Mickey often complained that "management" workers were doing the work of bargaining unit members.[1]

Early in the afternoon of May 8, 2001, while in the stockroom, Mickey saw three

---

1. In response to an increase in inventory loss, GITS had unilaterally changed personnel as-

individuals and asked what they were doing. She then accused them of "not working". The three people were Rick Hanson (a union member), Doug Graham (Manufacturing Manager for GITS), and Robert Smallwood (another union member). At the time, Robert Smallwood ("Smallwood") was the only African–American in the entire GITS workforce. Later that same day, Mickey again returned to the stockroom prompting Smallwood to approach. Smallwood asked why Mickey was "trying to get [him] in trouble in front of [his] boss." The argument between them escalated, during which time Mickey used several so-called "F-words". Mickey left the stockroom and shortly thereafter "clocked out" of work. While doing so, Mickey was overheard saying in reference to Smallwood, "he's nothing but a 'fucking nigger.'"

Although Mickey was apparently talking to herself, an investigation on the part of GITS indicated that at least four employees near the time clock heard her comment. One employee, Tara Hanson, was so angered by what Mickey said, she called Mickey "white trash". Mickey responded by explaining that Ms. Hanson could "kiss [her] ass." It is undisputed that Smallwood did not hear Mickey's comment.

Mickey was eventually discharged in response this incident, an action the Union grieved and ultimately arbitrated. On February 26, 2002, arbitrator Gerald Cohen ("the Arbitrator") entered an order returning Mickey to work, minus six months back pay. It is this arbitration award that is the basis of the dispute in this case.

GITS asserts there can be no question that Smallwood found the environment at GITS to be both hostile and abusive, and

that a reasonable person would find the environment created by Mickey's comment both hostile and abusive. GITS argues that the arbitration decision, and GITS by honoring the award, would further perpetuate the hostile environment Smallwood subjectively perceived and reasonable people (such as Ms. Hanson) objectively recognized. Honoring the arbitration decision, it is claimed, violates the public policy of an employer maintaining voluntarily compliance with Title VII. GITS, therefore, asks this Court to declare that GITS is not required to honor the arbitration award.

In resistance, the Union maintains the Arbitrator has not exceeded his authority by creating a remedy which reinstates Mickey, and, in any case, there is a very limited role a court can take in reviewing the decision of an arbitrator. The Union observes that Mickey was terminated for uttering a racial slur to herself which was overheard by her co-workers, not by the person the comment was directed (by implication) toward. Thus, the Union asserts that no evidence exists that shows that a member of an affected racial group was aware of Mickey's comment, let alone subjectively harmed by that comment. The target of Mickey's comment, Smallwood, did not hear the comment or suffer the sting from the impact of the words. In effect, the Union offers, there can be no victim in this case. For these reasons, the Union posits that honoring the arbitration award would not violate public policy, and GITS should be ordered to honor the arbitration award.

## DISCUSSION

### I. Arbitrator Authority.

 Both parties recognize the narrow scope of judicial review of arbitration

---

signed various tasks in the receiving area. Although the Union considered filing a grievance concerning this, it elected not to do so.

awards under collective bargaining agreements. *See Int'l Woodworkers of America v. Weyerhaeuser*, 7 F.3d 133, 135 (8th Cir. 1993). "Federal law, and in particular the Labor Management Relations Act of 1947, 29 U.S.C. § 173(d), 'reflect[s] a decided preference for private settlement of labor disputes without the intervention of government.'" *See MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers Local 499*, 228 F.Supp.2d 949, 955 (S.D.Iowa 2002) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). The Eighth Circuit Court of Appeals has summarized this limited review as follows:

> [T]he courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretations of the contract ... [a]s long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "[the arbitrator's] own brand of industrial justice," the award is legitimate.... Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the Agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

*See UFCW Local No. 88 v. Shop 'N Save Warehouse Foods. Inc.*, 113 F.3d 893, 894–95 (8th Cir.1997) (citing *Misco*, 484 U.S. at 36, 38, 108 S.Ct. 364) (which quotes and cites *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

 Both at oral argument and in its moving papers, GITS has argued that the Arbitrator has exceeded his authority in ordering Mickey's reinstatement. GITS characterizes the Arbitrator's decision as his own sense of "industrial justice" rather than a response to legal precedent under Title VII. However, "unless it can be said with positive assurance that the contract is not susceptible of the Arbitrator's interpretation," a reviewing court may not interfere with an arbitrator's award. *See UFCW Local No. 88*, 113 F.3d at 895 (citing *Kewanee Mach. Div., Chromalloy American Corp. v. Local Union No. 21, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 593 F.2d 314, 318 (8th Cir.1979)) (quoting *Int'l Bhd. of Elec. Workers v. Prof'l Hole Drilling, Inc.*, 574 F.2d 497, 503 (10th Cir. 1978)). If "'the arbitrator is even arguably construing or applying the contract and acting within the scope of [their] authority, that a court is convinced [the arbitrator] committed serious error does not suffice to overturn the decision.'" *Id.* (quoting *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers*, 913 F.2d 544, 559 (8th Cir. 1990) (quoting *Misco*, 484 U.S. at 38, 108 S.Ct. 364)). "In determining whether an arbitrator has exceeded his authority, the agreement must be broadly construed with all doubts being resolved in favor of the arbitrator's authority." *Id.*

 The collective bargaining agreement at issue contains provisions for nondiscrimination, discipline, grievance, and ultimate arbitration. The termination of Mickey's employment traveled through

that grievance process and arbitration. The Court finds the arbitration decision to be consistent with the authority granted under the collective bargaining agreement to review employee discipline arising out of the non-discrimination standard.

In this case, the remedy the Arbitrator ordered is drawn from the collective bargaining agreement GITS and the Union entered. The Arbitrator considered language in the collective bargaining agreement regarding discrimination as it related to Mickey's conduct. The Arbitrator found this case less serious than it could have been since discrimination requires a perpetrator and a victim, which scenario does not exist here. The Arbitrator believed Mickey's words were less stinging since they were not uttered in Smallwood's presence.

The Arbitrator then considered Mickey's twelve years of employment with GITS, during which time Mickey had never received a reprimand of any kind. The Court is satisfied that the Arbitrator was construing or applying the collective bargaining agreement. There is no basis upon which to effectively dispute that the essence of the arbitration award came from the collective bargaining agreement. *UFCW Local No. 88,* 113 F.3d at 894–95.

Under the particular facts and circumstances of this case, discharging Mickey was an overreaction by GITS, the Arbitrator determined. "[C]ourts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *See id.* With this in mind, this Court cannot conclude "with positive assurance that the contract is not susceptible of the Arbitrator's interpretation." *See id.* The Arbitrator in this case has not exceeded his authority, and this Court "[cannot] interfere with [the] arbitrator's award." *See id.* at 895.

## II. Public Policy.

Decisions of arbitrators who have not exceeded their contractual authority are almost always upheld, including the reinstatement of employees whose acts do not pose a danger to public health or safety. *See Iowa Electric Light & Power Co. v. Local Union 204,* 834 F.2d 1424, 1429 (8th Cir.1987). Nevertheless, if reinstatement would be contrary to public policy, then the arbitration award is unenforceable. *Eastern Assoc. Coal Corp. v. United Mine Workers of America, Dist. 17,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *see also W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). This exception arises from the general principle that courts may not enforce contracts contrary to public policy. *Misco,* 484 U.S. at 42–43, 108 S.Ct. 364. The Court must determine whether *reinstating* the grievant would violate public policy, not whether or not the grievant's conduct violated some public policy. *See Eastern Assoc. Coal Corp.,* 531 U.S. at 62–3, 121 S.Ct. 462. "[T]he public policy exception is narrow ...." *Id.* at 63, 121 S.Ct. 462.

Refusing to enforce an arbitration award based on public policy reasons is limited to situations where the contract, as interpreted, would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Iowa Electric Light & Power Co.,* 834 F.2d at 1427 (citing *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. 2177) (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). "Once the public policy question is raised, courts answer it by taking the facts as found by the arbitrator, but reviewing [the arbitrator's] conclusions de novo." *Id.* (citing *E.I. DuPont de Nem-*

*ours & Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 617 (7th Cir.1986)).

 GITS contends the arbitrator failed to follow precedent spawned by Title VII. To adequately assess the public policy argument, therefore, some discussion of what constitutes a violation of Title VII becomes necessary.

 Title VII makes it unlawful for an employer to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)–2(a)(1). Title VII embraces more than just "terms" and "conditions" of employment, and "includes discriminatory harassment so severe or pervasive as to alter the conditions of employment and create a hostile work environment." *Carter v. Chrysler,* 173 F.3d 693, 700 (8th Cir.1999). Under Title VII, "[e]mployees are entitled to a workplace free from 'discriminatory intimidation, ridicule, and insult' motivated by the employees' membership in a protected class." *Carter,* 173 F.3d at 700 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

 In *Harris,* a sexual harassment case,[2] the Supreme Court held that a Title VII hostile environment claim will succeed only where the conduct at issue is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment", and where the victim "subjectively perceives the environment to be abu-

sive." *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. By deciding *Harris* in this fashion, the Supreme Court made a policy choice, selecting "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *See id.* at 21, 114 S.Ct. 367. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* "If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22, 114 S.Ct. 367.[3]

 "Title VII was not intended to eliminate immediately all private prejudice and biases." *See Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 350 (6th Cir. 1988). Beyond question, Title VII was not intended to become a "general civility code". *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *see also Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

In this case, the Union reminds the Court that there is no victim of harassment since the words were not spoken directly to Smallwood nor intended to be overheard by anyone. According to the Union, the facts of this case are not as

**2.** Generally, when evaluating racial harassment claims, it is appropriate to draw upon the standards used when evaluating sexual harassment claims. *Faragher,* 524 U.S. at 786–87, n. 1, 118 S.Ct. 2275.

**3.** Thus, the policy behind Title VII is to protect certain qualified persons from severe or pervasive conduct which is both objectively hostile or abusive and subjectively perceived as such. In this case, the fact that Smallwood

did not directly hear Mickey's comment means he could not have subjectively perceived a hostile or abusive environment. While anyone could have notified Smallwood of Mickey's comment, and the record reflects Doug Graham, one of the persons present at the time clock when Mickey uttered her comment, is Smallwood's father-in-law, GITS has not argued Smallwood was told of Mickey's comments.

egregious as they would have been had Mickey used the same words directly to Smallwood. From the record presented, the Union would have this Court draw the conclusion that GITS is not permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive enough to have altered the conditions of Smallwood's employment with GITS, required to amount to a Title VII violation. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. It would appear to this Court that the Union's "no victim exists" argument is related to *Harris'* direction that "[i]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22, 114 S.Ct. 367. Finally, the Union argues that by GITS honoring the arbitration award and reinstating Mickey, GITS would not be sending the message that GITS accepted, or in any way condoned, Mickey's comments, since the arbitration award effectively docks Mickey six months' back pay.

Additionally, the Union argues termination is not the only option available to redress this situation because employee training, potential transfers of assignments, written warnings, and various reprimands are all available options to indicate that GITS does not encourage Title VII violations. The Union asserts that when these reasons are combined with the facts of this case, the arbitration award should not be seen as offensive to public policy, and this Court should order GITS to honor the arbitration award.

GITS points out the strong public policy against racial harassment in the workplace and argues the roots of this policy are grounded in Title VII itself. GITS argues that, if forced to honor the arbitration award to reinstate Mickey, it will not be voluntarily complying with Title VII; and, therefore, honoring the arbitration award would violate public policy. GITS relies on *Winbush v. Iowa,* 66 F.3d 1471, 1476 n. 7 (8th Cir.1995), for the principle that the existence of this public policy can also be ascertained by remembering that employers are subject to suit for racial harassment committed at the job. Furthermore, the company points to *Tamko Roofing Products, Inc. v. United Steelworkers of America, Local 10711,* 2000 U.S. Dist. LEXIS 21856 (N.D.Ala.2000), wherein the district court found that both Title VII and 42 U.S.C. § 1981 established a dominant national policy forbidding racial discrimination and harassment in the workplace. *See Tamko Roofing Products, Inc. v. United Steelworkers of America, Local 10711,* 2000 U.S. Dist. LEXIS 21856, at \*11–\*12 (N.D.Ala.2000).

Although it is undisputed that Smallwood did not hear Mickey's comment, GITS asserts it is beyond question that Robert Smallwood found the environment at GITS both hostile and abusive when Mickey said he was nothing but a "fucking nigger"; likewise, they see no question that a reasonable person would find the environment created by Mickey's conduct both hostile and abusive. GITS' essential position is that the use of the word "nigger" is so severely dehumanizing that its use in the workplace even infrequently can create an intolerable work environment. *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1097 (M.D.Ala.1990); *see also Bailey v. Binyon,* 583 F.Supp. 923, 927 (N.D.Ill.1984) (indicating that "use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se."). Although Mickey made this comment only once. GITS points out that "even a single episode of harassment, if severe enough, can establish a hostile work environment." *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426,

437 (2d Cir.1999) (quoting *Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2d Cir.1997)).

Ultimately, GITS argues it has the legal duty to prevent discrimination and harassment in the workplace. GITS' position comes from analogy to sexual harassment cases. *See, Stroehmann Bakeries, Inc. v. Local 776 Int'l Bhd. of Teamsters,* 969 F.2d 1436, 1442 (3d Cir.1992) (discussing an "employers ability to ... prevent and sanction sexual harassment in the workplace" and pointing to an EEOC regulation found at 29 C.F.R. § 1604.11(f), as indicating that "[p]revention is the best tool for elimination of sexual harassment"). In sexual harassment cases, courts have directed that employers have an obligation to prevent and sanction sexual harassment in the workplace. *See id.* Therefore, by implication, GITS argues employers have an equal duty to prevent or sanction racial harassment in the workplace. For these reasons, GITS believes that honoring the arbitration award would violate the public policy of an employer's voluntary compliance with Title VII, and, as such, GITS should not be forced to honor the award. GITS, therefore, moves this Court to rule it need not honor the arbitration award.

 This Court agrees Mickey's words and conduct were highly inflammatory and offensive. Significant to the legal analysis of this case, however, is the fact that the record before the Court demonstrates this was a one-time occurrence. In the Eighth Circuit, a few isolated racial slurs are not sufficient to violate Title VII. *See Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981); *see also Powell v. Missouri State Highway and Transp. Dep't,* 822 F.2d 798 (8th Cir.1987). Under Eighth

Circuit precedent, "[a] work environment must be *dominated* by racial hostility and harassment to rise to the level of a Title VII violation." *See Ways, Sr. v. City of Lincoln Police Dep't,* 871 F.2d 750, 754 (8th Cir.1989) (emphasis added). Supreme Court case law on Title VII also indicates the same. *See, e.g., Harris,* 510 U.S. at 21, 114 S.Ct. 367 (indicating that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). "'[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *See id.* (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399).[4]

Although GITS has referenced cases in which one-time expressions of racial slurs have been found to justify the termination of employees, serious factual distinctions between those cases and the facts of this case exist. For example, in *Tamko,* a long-time employee of Tamko, with no history of any harassing conduct of any kind, was working inside the company's shipping office near a sliding glass window. *Tamko,* 2000 U.S. Dist. LEXIS 21856, at *4. Williams, an African–American employee of another company, "was standing outside the shipping office waiting for [the Tamko employee] to open the window...." *Id.* at *4–*5. The Tamko employee did not notice Williams, and, when told that Williams was waiting for the window to open, the

---

4. At oral argument, GITS argued that use of the word "nigger" is so offensive that using the word takes this case outside of the conceptual analogy of cases involving race or sexual harassment and the typical analysis applied under Title VII. The Court cannot

agree to so sweeping a legal view. GITS itself provided case citation in which the court applied typical Title VII analysis, even in a case involving allegations of racial harassment arising from use of the word "nigger". *See, e.g., Sims,* 766 F.Supp. 1052 (N.D.Ala.1990).

Tamko employee opened the window and said to Williams, "Hey, man, I'm sorry, I didn't see you. There's not enough light. Maybe you need to paint your face white." *Id.* at *5.[5] Tamko eventually terminated its employee, and the union grieved and ultimately arbitrated this termination. Identical to the situation at bar, the arbitrator reinstated the Tamko employee, *see id.* at 11, prompting Tamko to go to United States District Court seeking an order vacating the arbitration award, arguing reinstatement would violate public policy. *Id.* at *2. The district court concluded that ordering Tamko to reinstate its discharged employee would, under the facts presented, violate public policy. *Id.* at *24–25.

In *Tamko*, however, the racially offensive comment was directly made to Williams. *Id.* at *5. Thus, in terms the Union uses here, there was a "victim" in *Tamko*, whereas in the case at bar there was not, since Smallwood was unaware of Mickey's comment. Additionally, in *Tamko*, the arbitrator ordered reinstatement with full back pay, *see id.* at 11, which is not the situation in the case at bar.

GITS also argues *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840 (2d Cir.1990), is similar to the instant case. In *Newsday, Inc.*, the employer terminated an employee for repeated instances of blatant sexual harassment. *See Newsday, Inc.*, 915 F.2d at 842–43. These multiple incidents all involved the aggressor directing his sexual harassment directly to his victims. *Id.* at 842. The arbitrator ruled that "these offenses are not ones that call for immediate discharge; instead, such offenses call for the application of progressive discipline." *Id.* at 843. Ultimately, the arbitrator concluded that the dis-

charged employee should be reinstated without back pay. *Id.*

The district court in *Newsday* vacated the arbitration decision, "finding that [the arbitration award] offended an explicit public policy condemning sexual harassment in the work place[.]" *Id.* On appeal, the Second Circuit Court of Appeals affirmed the district court's vacatur, finding:

[The arbitration] award of reinstatement completely disregarded the public policy against sexual harassment in the work place. The arbitrator has also disregarded [a prior arbitration] ruling [a few years prior] that any further acts of harassment by [the discharged employee] would be grounds for discharge. Instead, [the arbitration] award condones [the discharged employees'] latest misconduct; it tends to perpetuate a hostile, intimidating and offensive work environment. [The discharged employee] has ignored repeated warnings. Above all, the award prevents Newsday from carrying out its legal duty to eliminate sexual harassment in the work place.

*See id.* at 845. As with *Tamko*, there are similar factual distinctions that make *Newsday*'s persuasive authority less so. For instance, in *Newsday*, not only was the offending conduct directed to and perceived as offensive by the intended "target", but the harasser had harassed multiple times before. *Id.* at 845. These important facts are wholly absent from the case at bar.

GITS also suggests the facts of this case are similar to those in *Stroehmann Bakeries*. In *Stroehmann Bakeries*, an employee was discharged for sexually harassing a customer's employee; at arbitration, the arbitrator reinstated the employee with

---

5. Williams believed the Tamko employee told him, "You ought to paint your face so I can see you better." *Id.* at *5. The only other person to hear the comment testified the statement was, "Man, you need to put some white shoe polish or something on your face. I didn't see you standing there." *Id.*

full back pay, less interim earnings. *Stroehmann Bakeries,* 969 F.2d at 1440. In awarding reinstatement, the arbitrator did not make any findings as to whether the alleged sexual harassment actually occurred; instead, the arbitrator focused on the fact that the employer had insufficiently investigated the alleged incident. *Id.* The district court found the reinstatement award violated the well-defined public policy against sexual harassment in the workplace. *Id.* The Third Circuit agreed insofar as it reinstated the employee without a determination that the harassment at issue did not occur because the "award would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred." *Id.* at 1442. GITS implies that, just as in *Stroehmann Bakeries,* this Court should find the arbitration award violates public policy because the Arbitrator reinstated Mickey without reviewing the company's actions in light of the requirements placed on them by Title VII.

Major differences do exist between the facts of *Stroehmann Bakeries* and the facts of this case. For instance, in the case at bar, the arbitration award provides that Mickey be docked six-months back pay, unlike in *Stroehmann Bakeries* where the arbitration award called for full reinstatement. *See id.* at 1437. Moreover, in *Stroehmann Bakeries,* the use of the sexually harassing words and conduct was again directed to, and personally perceived as sexually harassing, by the victim, *see id.* at 1439, which is not the situation in the present case. Most significantly, however, is that "Title VII does not impose an unreasonable or potentially unconstitutional burden on employers." *See Davis,* 858 F.2d at 350. " '[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114

S.Ct. 367 (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399). It is only where such conduct becomes so "severe or pervasive" that a Title VII violation may exist. *Id.* Under this precedent then, Mickey's one-time comment is insufficient to trigger Title VII, and GITS' argument that the Arbitrator did not analyze the requirements placed on employers by Title VII is unpersuasive.

In response to these cases, the Union points out that the Eighth Circuit Court of Appeals has held that a few isolated racial slurs are not sufficient to violate Title VII. *See Bunny Bread Co.,* 646 F.2d at 1257. Finding "no steady barrage of opprobrious racial comment", the Eighth Circuit in *Bunny Bread* discussed that "[t]he use, if any, of racial terms was infrequent" and limited to "casual conversation among employees." *Id.* "Such slurs ... were largely the result of individual attitudes and relationships which, while certainly not to be condoned, simply do not amount to violations of Title VII." *Id.* "[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, [or] are accidental, or are sporadic[,] do not trigger Title VII's sanctions." *Id.* (quoting *EEOC v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381, 384 (D.Minn.1980)) (citations omitted).

In *Gilbert v. City of Little Rock,* 722 F.2d 1390 (8th Cir.1983), the Court of Appeals suggested that a plaintiff complaining of racial harassment needs to prove that the alleged conduct established a "pattern of harassment". *Gilbert,* 722 F.2d at 1394. "A work environment must be dominated by racial hostility and harassment to rise to the level of a Title VII violation." *See Ways, Sr.,* 871 F.2d at 754 (citing *Gilbert,* 722 F.2d 1390 (8th Cir. 1983)). Under the facts of this case, GITS simply cannot demonstrate that the racial

discrimination environment at its plant was "so excessive and opprobrious as to constitute an unlawful employment practice under Title VII." *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir.1977).[6] At oral argument, the Union attempted to further distinguish the *Tamko* and *Newsday* decisions cited by GITS by pointing out that the court, in deciding the public policy issue in those cases, focused on the offending conduct rather than on whether reinstatement violated an established public policy. After the Supreme Court directive in *Eastern Assoc. Coal Corp.*, 531 U.S. at 62–3, 121 S.Ct. 462, that the focus must remain on whether reinstatement violates an established public policy, the Union argues cases like *Tamko* and *Newsday* are no longer persuasive.

In the instant case, nothing in the record suggests that GITS in any way tolerates or condones the continuing existence of a work environment predominated by race-based animus. Moreover, in *Murphy Motor*, a case positively cited in *Bunny Bread* for another premise, the *Murphy Motor* court concluded "[i]f management knows or should know of incidents of racial harassment *that are more than sporadic*, it has a responsibility to take reasonable affirmative steps to eliminate such inci-

dents." *See Murphy Motor*, 488 F.Supp. at 386 (emphasis added) (citations omitted). *Murphy Motor* would suggest that, in a case involving this one time comment, any duty Title VII may place on GITS has yet to attach, since there has been nothing more than sporadic conduct. *Id.* at 386.

■■■ "[W]hile Title VII does not require an employer to fire all 'Archie Bunkers' in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinions in a way that abuses or offends their coworkers." *See Davis*, 858 F.2d at 350. In this case, GITS fired Mickey, arbitrated Mickey's discharge, and has come to this Court in an effort to avoid honoring the arbitration award reinstating Mickey. GITS appears to have done all it could to aggressively respond to Mickey's conduct in the workplace.

### CONCLUSION

In light of the limited role a court plays when reviewing a properly fashioned arbitration award, in view of the established public policy of Title VII as indicated in Supreme Court and Eighth Circuit precedent, and focusing on whether *reinstating* Mickey violates public policy, *see Eastern Assoc. Coal Corp.*, 531 U.S. at 62–3, 121

---

**6.** As sexual harassment cases are analyzed in similar fashion to racial harassment cases, *see Faragher*, 524 U.S. at 786–87, n. 1, 118 S.Ct. 2275, this Court pauses briefly to point out that recent Eighth Circuit holdings in the area of sexual harassment confirm that in this circuit, there is a heavy burden in establishing a Title VII violation based on sexual harassment from singular and isolated instances of conduct. *See, e.g., Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir.2003) (finding that a single incident of a coworker's squeezing of employee's buttocks, and subsequent encounter in which co-worker joked with employee about the incident, did not rise to the level of severe and pervasive misconduct which altered the conditions of the em-

ployee's employment and created an abusive working environment, necessary elements to establish a prima facie claim of sexual harassment employment discrimination). This is not to say that a single incident, if serious enough, will never amount to changes in the terms and conditions of employment sufficient to find harassment. *See, e.g., Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 454–57 (8th Cir.2001) (finding there was sufficient evidence for a jury to conclude that, during a business trip, a supervisor, who would not leave Moring's hotel room for several hours, insisted she "owed" him for her job, attempted to kiss her, and touched her thigh, had sexually harassed Moring).

S.Ct. 462, this Court concludes the Arbitrator acted within established authority, and honoring the arbitration award under the facts of this case would not violate public policy. GITS is ordered to comply with the arbitration award fully, including the six-month reduction of Mickey's back pay. The Union's Motion for Summary Judgment (Clerk's No. 15) is **GRANTED**, and GITS' Motion for Summary Judgment (Clerk's No. 7) is **DENIED**. The case, including the counterclaim, is dismissed.

**IT IS SO ORDERED.**