[No. 65037-8-I.   Division One.   October 17, 2011.]

THE PORT OF SEATTLE, *Respondent*, v. ANTHONY D. VIVENZIO
ET AL., *Defendants*, INTERNATIONAL UNION OF OPERATING
ENGINEERS, AFL-CIO, LOCAL 286, *Appellant*.

308

*Dmitri L. Iglitzin* and *Sean M. Leonard* (of *Schwerin Campbell Barnard Iglitzin & Lavitt LLP*); and *Terry A. Roberts*, for appellant.

*Diana S. Shukis* and *Michael S. Brunet* (of *Cairncross & Hempelmann PS*), for respondent.

*Martin S. Garfinkel* on behalf of Washington State Labor Council, amicus curiae.

¶1 LEACH, A.C.J. — A Washington court may vacate an arbitration award that violates a well-defined, explicit, and dominant public policy.[1] The International Union of Operating Engineers, Local 286 (Union) appeals a superior court order vacating an arbitrator's decision under this public policy exception. The arbitrator reinstated a Port of Seattle (Port) employee fired for hanging a noose at work, reducing his discipline from termination to a retroactive 20-day suspension. We agree that the arbitration award violated Washington's well-defined, explicit, and dominant public policy against discrimination. However, we hold the superior court did not have the authority to determine the appropriate discipline for the employee. We therefore affirm the superior court's decision to vacate the arbitrator's decision, reverse the superior court's revised award, and remand for further proceedings consistent with this opinion.

## FACTS

¶2 In December 2007, port employee Mark Cann tied a noose in a length of rope and hung it on a rail overlooking a high traffic work area. Rafael Rivera, an African American employee with whom Cann "had a recent falling out," was working within 30 feet of the noose. Rivera saw and reported it. After a lengthy investigation, the Port concluded that

---

[1] *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 435, 219 P.3d 675 (2009) ("[L]ike any other contract . . . an arbitration decision arising out of a collective bargaining agreement can be vacated if it violates public policy." (citing *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 67, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000))).

Cann had violated its zero-tolerance antiharassment policy and terminated him.[2]

¶3 The Union initiated a grievance under its collective bargaining agreement with the Port. Following unsuccessful attempts to settle the grievance, the matter proceeded to arbitration. The parties stipulated to these issues: "Did the Employer have just cause for their [sic] termination of Mark Cann on February 11, 2008, and, if not, what shall the remedy be?"

¶4 To guide his decision, the arbitrator considered the collective bargaining agreement between the Union and the Port, the Port's antiharassment policy, the Port's work rules, and the aviation maintenance work rules, all of which inform employees that workplace harassment and discrimination are prohibited. The Port's work rules state that the Port "does not tolerate illegal harassment in the workplace," including "[d]isplaying or circulating pictures, objects, or written materials . . . that demean or show hostility to a person because of the person's age, race, color, national origin/ancestry . . . or any other category protected by law." The Port's rules warn employees that it has "zero-tolerance" for workplace harassment, meaning "[a]ny alleged violation of this (anti-harassment) policy will generate an investigation and, if verified, will be considered 'gross misconduct' and can subject an employee to immediate termination."

¶5 In addition to these rules and policies, the arbitrator also considered Cann's testimony. Cann admitted that he received a copy of the Port's rules, underwent antiharassment training, and understood the Port's zero-tolerance policy. Nevertheless, Cann admitted that he tied nooses in ropes at the workplace "a few times" due to his "twisted sense of humor." Cann claimed he was unaware of the noose's discriminatory symbolism. Instead, he linked nooses to "Cowboys and Indians." Cann said he intended the

---

[2] Cann had been a port employee for 12 years. At the time, Cann held the position of maintenance operating engineer and was a union shop steward.

particular noose to be a prank on Dick Calhoun, a 75-year-old employee with whom he had a "joking relationship." According to Cann, when he tied the noose, he remarked, "This is for Dick Calhoun, to put him out of his misery."[3]

¶6 When Cann heard that the noose had offended Rivera, he apologized. Wallace Mathes, Cann's supervisor, testified that Cann tried to apologize to Rivera "while trying to preserve his macho image," opining, "He did his best." During the apology, however, Cann produced the page from the dictionary defining "noose," "apparently to counter the notion that he had tied a noose."

¶7 Although Rivera and Calhoun did not testify, leaving the arbitrator "with less than solid impressions of the impacts upon [them]," the arbitrator reviewed documents from the Port's investigation, including interviews and e-mails from Rivera. In one interview, Rivera recounted that Cann remarked to Rivera that Martin Luther King Day was "take a nigger to lunch day."[4] In an e-mail, Rivera told the Port that seeing the noose made him feel "not threatened, but angry." Rivera explained that as a member of the military in the 1960s, he had been stationed in the South, where he "witnessed firsthand and lived daily with racism." After Rivera saw Cann's noose, he experienced "many sleepless nights" and "relive[d] a time in [his] life that was demeaning, degrading, humiliating, and de-humanizing."

¶8 Following a two-day hearing, the arbitrator issued a written decision. The arbitrator found, "[A] noose is an object of a nature such that its display would reasonably be expected to be demeaning or show hostility to people of a protected class within the purview of the policies of the Employer." By hanging the noose, Cann "performed acts

---

[3] E-mails in the record between port employees during the investigation mention that age discrimination is also prohibited by the Port's antiharassment policy, although that does not appear to have been a factor in the Port's decision to terminate Cann.

[4] Another represented port employee told an investigator that Cann had "race problems" but later retracted his statement.

constituting a violation of the Employer's anti-harassment policy."[5] The arbitrator also noted that he doubted the sincerity of Cann's apology to Rivera. When assessing the reasonableness of the Port's policies, the arbitrator observed that the Port had several interests at stake when it disciplined Cann. Those interests included "the elimination of discrimination in the workplace, protecting itself from costly lawsuits that could arise from discrimination, and the preservation of its reputation." However, when assessing the reasonableness of the Port's discipline, the arbitrator stated, "[I]n this matter, [Cann] was more clueless than racist." Therefore, the arbitrator concluded that Cann's conduct warranted substantial discipline but did not provide just cause to terminate him. The arbitration award reinstated Cann with lost earnings and benefits and reduced his discipline from termination to a retroactive 20-day suspension.[6]

¶9 The Port petitioned King County Superior Court for a writ of certiorari, alleging that the arbitrator exceeded his jurisdiction and acted contrary to public policy. The superior court accepted review and found in the Port's favor, vacating the arbitration award because it violated Washington's public policy prohibiting discrimination in the workplace. The superior court explained,

> Employers have an affirmative duty to provide a workplace free from racial harassment and discrimination. Employees

---

[5] In light of this finding, we find inaccurate appellant's insistence that "Mr. Cann was expressly found *not* to have engaged in racially harassing misconduct."

[6] The arbitrator relied on a federal arbitration decision, *Federal Aviation Administration*, 109 Lab. Arb. Rep. (BNA) 699 (1997) (Briggs, Arb.). In that decision, an air traffic controller, who had not received any diversity training, hung a noose as a Halloween prank in a location where it went unnoticed. 109 Lab. Arb. Rep. at 700-01, 704. He received a two-day suspension, while another employee, who, a month later, threatened African American employees with a different noose, received only a written warning. 109 Lab. Arb. Rep. at 700-01, 705. The arbitrator, finding that the employee meant no harm by making and displaying the noose and did not understand its racial significance, reduced the employee's suspension to a written admonishment. 109 Lab. Arb. Rep. at 705-06. We note that as an arbitration decision, it necessarily does not address public policy considerations or the public policy exception.

have a right to such a workplace. The Award undermined the well-defined, explicit and dominant public policy expressed in [the Washington Law Against Discrimination, ch. 49.60 RCW] because it was excessively lenient. Under the Award, Mr. Cann was ordered back to work with back pay and without significant consequence, without training or other warning.

The court ordered the Port to reinstate Cann but lengthened his suspension from 20 days to 6 months. The court also ordered Cann to "write a sincere letter of apology" and attend diversity and antiharassment training. Finally, the court imposed a 4-year probationary period, during which Cann would be subject to immediate and final termination for any additional policy violations.

¶10 The Union appeals.[7]

## ANALYSIS

¶11 We must decide whether the arbitration award here conflicts with an explicit, well-defined, and dominant public policy. This involves a question of law, which we review de novo.[8]

¶12 Cases like this one necessarily involve competing public policy concerns: here, the finality of arbitration awards competes with the elimination and prevention of discrimination. Because Washington public policy strongly supports alternative dispute resolution and favors the finality of arbitration awards,[9] we show great deference to arbitration decisions, particularly in the labor management context.[10] We limit our review to whether the arbitrator acted illegally by exceeding his or her authority under the

---

[7] The Washington State Labor Council filed an amicus curiae brief in support of the Union.

[8] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 434.

[9] *Yakima County v. Yakima County Law Enforcement Officers Guild*, 157 Wn. App. 304, 317, 237 P.3d 316 (2010) (citing *Davidson v. Hensen*, 135 Wn.2d 112, 118, 954 P.2d 1327 (1998)).

[10] *Klickitat County v. Beck*, 104 Wn. App. 453, 460, 16 P.3d 692 (2001).

collective bargaining agreement.[11] We do not review the merits of the underlying dispute; "the arbitrator is the final judge of both the facts and the law, and 'no review will lie for a mistake in either.' "[12] "[A] more extensive review of arbitration decisions would weaken the value of bargained for, binding arbitration and could damage the freedom of contract."[13]

¶13 Despite this public policy in favor of finality, we may vacate an arbitration award that violates an " 'explicit,' 'well defined,' and 'dominant' public policy."[14] We determine whether a public policy is explicit, well-defined, and dominant by reference to laws and legal precedents, and not simply from " 'general considerations of supposed public interests.' "[15] We do not examine whether the employee's underlying conduct violates a public policy, but whether the arbitrator's decision does.[16]

¶14 First, we ask whether Washington has an applicable explicit, well-defined, and dominant public policy. The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, is, indisputably, such a policy. When the Washington Legislature exercised the State's police power to fulfill our state constitution's provisions concerning civil rights by enacting the WLAD, it declared that "discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a

---

[11] *Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125*, 150 Wn.2d 237, 245-46, 76 P.3d 248 (2003).

[12] *Clark County Pub. Util. Dist.*, 150 Wn.2d at 245 (internal quotation marks omitted) (quoting *Dep't of Soc. & Health Servs. v. State Pers. Bd.*, 61 Wn. App. 778, 785, 812 P.2d 500 (1991)).

[13] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 435.

[14] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 435 (internal quotation marks omitted) (quoting *E. Associated Coal Corp.*, 531 U.S. at 62).

[15] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 435 (quoting *E. Associated Coal Corp.*, 531 U.S. at 62).

[16] *E. Associated Coal Corp.*, 531 U.S. at 62-63.

free democratic state."[17] The Washington Legislature directed that the WLAD "shall be construed liberally for the accomplishment of the purposes thereof."[18]

¶15 The WLAD also declared the right to be free from discrimination in employment to be a civil right: "The right to be free from discrimination because of race . . . is recognized as and declared to be a civil right. This right shall include, but not be limited to: (a) The right to obtain and hold employment without discrimination."[19] In addition, through the WLAD, the legislature imposed liability upon an employer for both its own discrimination and that of any of its employees who are acting directly or indirectly in its interest.[20]

¶16 According to our Supreme Court, the WLAD embodies " 'public policy of the highest priority,' "[21] the "overarching purpose" of which is " 'to deter and to eradicate discrimination in Washington.' "[22] It has also stated that the WLAD "clearly condemns employment discrimination as a matter of public policy."[23] And we have interpreted the WLAD to impose upon an employer with affirmative knowledge of its violation in the workplace an obligation to take remedial measures adequate to persuade potential violators to refrain

---

[17] RCW 49.60.010.

[18] RCW 49.60.020.

[19] RCW 49.60.030(1); *see also Roberts v. Dudley*, 140 Wn.2d 58, 69-70, 993 P.2d 901 (2000).

[20] *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 360 n.3, 361, 20 P.3d 921 (2001); *see also Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 793, 98 P.3d 1264 (2004) ("Once an employer has actual knowledge through higher managerial or supervisory personnel of a complaint of sexual harassment, then the employer must take remedial action that is reasonably calculated to end the harassment.").

[21] *Antonius v. King County*, 153 Wn.2d 256, 267-68, 103 P.3d 729 (2004) (internal quotation marks omitted) (quoting *Phanna K. Xieng v. Peoples Nat'l Bank of Wash.*, 120 Wn.2d 512, 521, 844 P.2d 389 (1993)).

[22] *Brown*, 143 Wn.2d at 360 (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43 (1996)).

[23] *Roberts*, 140 Wn.2d at 69-70.

from unlawful conduct.[24] We have cautioned that a punishment that fails to take into account the need to maintain a discrimination-free workplace may subject the employer to suit.[25] In light of the foregoing, we conclude that the WLAD contains an explicit, well-defined, and dominant public policy with the dual purpose of ending current discrimination and preventing future discrimination.

¶17 Next we must decide whether the arbitration award violated this public policy by improperly limiting the Port's ability to comply with the WLAD. Specifically, we must decide whether the arbitrator's decision to reinstate Cann with back pay and benefits, subject only to a 20-day retroactive suspension, impermissibly conflicts with the Port's efforts to fulfill its affirmative duty to eliminate and prevent racial discrimination in the workplace. Because this case presents an issue of first impression in Washington, we find some guidance from other jurisdictions that have considered the scope of the public policy exception in the discrimination context.

¶18 In *City of Brooklyn Center v. Law Enforcement Labor Services, Inc.*,[26] a police officer was terminated for repeated acts of sexual harassment. The arbitrator concluded that much of the alleged conduct was time barred and that "the remaining conduct, while serious, did not warrant outright dismissal."[27] He reinstated the officer without back pay, noting that the period between termination and reinstatement would constitute the appropriate discipline.[28] The Minnesota Court of Appeals vacated the arbitration award in light of Minnesota's "well-defined and dominant public policy that imposes upon governmental

---

[24] *Perry*, 123 Wn. App. at 793 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).

[25] *Perry*, 123 Wn. App. at 793 (quoting *Ellison*, 924 F.2d at 883).

[26] 635 N.W.2d 236, 238-39 (Minn. Ct. App. 2001).

[27] *City of Brooklyn Center*, 635 N.W.2d at 240.

[28] *City of Brooklyn Center*, 635 N.W.2d at 240.

units an affirmative duty to take action to prevent and to sanction sexual harassment and sexual misconduct by law enforcement officers"[29] and the employer's "duty to prevent sexual harassment in the workplace."[30] Allowing the officer to continue his employment, according to the court, would have been "tantamount to exempting the city from its duty to enforce its own policy and the public policy against sexual harassment."[31]

¶19 Similarly, in *State v. AFSCME, Council 4, Local 387*,[32] an on-duty corrections officer directed an obscene racial epithet to a state legislator in a telephone message. The employer terminated the officer's employment, and the arbitrator reduced the termination to an unpaid, 60-day suspension.[33] The Connecticut Supreme Court found that the arbitrator's attempts to rationalize the officer's conduct " 'minimize[d] society's overriding interest in preventing conduct such as that at issue in this case from occurring.' "[34] The court vacated the arbitrator's decision because a " 'lesser sanction . . . would, very simply, send the message that . . . poor judgment, or other factors, somehow renders the conduct permissible or excusable.' "[35]

---

[29] *City of Brooklyn Center*, 635 N.W.2d at 242.

[30] *City of Brooklyn Center*, 635 N.W.2d at 243. We acknowledge that the repeat nature of the officer's conduct was important to the Minnesota Court of Appeals' holding in *City of Brooklyn Center*. But Washington's public policy exception does not require prior offenses and warnings because an employer has a duty to take corrective action once it has actual knowledge of any illegal discrimination. *Perry*, 123 Wn. App. at 793. " 'If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach.' " *Perry*, 123 Wn. App. at 794 (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1528-29 (9th Cir. 1995). If we were to hold that the public policy exception is applicable only when an employee is a repeat offender, it would directly interfere with an employer's ability to appropriately discipline its employees and eliminate discriminatory acts in the workplace.

[31] *City of Brooklyn Center*, 635 N.W.2d at 244.

[32] 252 Conn. 467, 747 A.2d 480, 482 (2000).

[33] *AFSCME*, 747 A.2d at 483.

[34] *AFSCME*, 747 A.2d at 486 (alteration in original).

[35] *AFSCME*, 747 A.2d at 486.

¶20 The Union cites two cases, *Way Bakery v. Truck Drivers Local No. 164*[36] and *Gits Manufacturing Co. v. Local 281 International Union*,[37] where courts upheld arbitration awards reinstating employees who had engaged in discriminatory conduct. The arbitration awards in those cases, however, have an important, distinguishing characteristic: the arbitrator imposed a penalty far harsher than 20 days. In both cases, the employees received a 6-month suspension from work, and in *Way Bakery* the arbitrator imposed a 5-year probationary period.[38] Given the significant sanctions in those cases, we find they support the position advanced by the Port—that compliance with the WLAD requires more discipline than occurred here—not that of the Union.[39]

¶21 However, "American courts differ in their application of the public policy exception."[40] Cases from other jurisdictions provide some guidance but rely on analyses of the public policies of other jurisdictions. They do not analyze what is at issue in this case, the public policy of the State of Washington. Therefore, our analysis depends largely upon the legislature's expression of an explicit, well-defined, and dominant public policy. Here, the arbitra-

---

[36] 363 F.3d 590 (6th Cir. 2004). In that case, an employee told a black co-worker to "relax Sambo." 363 F.3d at 592.

[37] 261 F. Supp. 2d 1089 (S.D. Iowa 2003). In *Gits*, a supervisor called another employee a "fucking nigger." 261 F. Supp. 2d at 1092.

[38] *Way Bakery*, 363 F.3d at 595; *Gits*, 261 F. Supp. 2d at 1092.

[39] In a statement of supplemental authority, the Union cites *City of Richmond v. Service Employees International Union, Local 1021*, 189 Cal. App. 4th 663, 118 Cal. Rptr. 3d 315 (2010), *review denied* (Jan. 12, 2011), where the California Court of Appeals upheld an arbitrator's decision to reinstate an employee accused of sexual harassment because the employer failed to act on the accusation within the time limit set forth in the collective bargaining agreement. The court held that public policy did not preclude arbitration enforcement of the limitation period. 189 Cal. App. 4th at 671-72. Because the *Service Employees International Union* court was asked to decide a different issue than the one presented here, it is inapposite.

[40] *Serv. Emps. Int'l Union*, 189 Cal. App. 4th at 674-75 ("[C]ase law on [the] public policy exception to arbitral finality 'is not just unsettled, but also is conflicting and indicates further evolution in the courts.'" (quoting 1 JAY E. GRENIG, ALTERNATIVE DISPUTE RESOLUTION § 24:19, at 622 (3d ed. 2005))).

tor applied seven considerations to determine that Cann violated the Port's antiharassment policy but that a 20-day suspension was the appropriate sanction:

1. Did the Employer give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

2. Was the Employer's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the Employer's business and (b) the performance that the Employer might properly expect of the employee?

3. Did the Employer, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

4. Was the Employer's investigation conducted fairly and objectively?

5. At the investigation, did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?

6. Has the Employer applied its rules, orders, and penalties even-handedly and without discrimination to all employees?

7. Was the degree of discipline administered by the Employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the Employer?[41]

¶22 The arbitrator answered the first five questions "yes." He characterized question 6 as an affirmative defense that the Union failed to prove. The arbitrator relied primarily upon his answer to question 7 to decide whether to modify the discipline of termination. He answered question 7 "no." However, none of the seven questions or the arbitrator's analysis of the appropriate discipline take into account the dominant public policies of the WLAD, including a Washington employer's affirmative duty to impose suffi-

---

[41] The arbitrator cited *Enterprise Wire Co.*, 46 Lab. Arb. Rep. (BNA) 359 (1966) (Daugherty, Arb.), as the source for these considerations, known as the "Seven Tests."

cient discipline to "send a strong statement"[42] adequate to persuade both Cann and potential violators to refrain from unlawful conduct. By imposing such a lenient sanction, the arbitrator minimized society's overriding interest in preventing this conduct from occurring[43] and interfered with the Port's ability to discharge its duty under the WLAD to prevent future acts of discrimination. By describing Cann's conduct as "more clueless than racist," the arbitrator " 'very simply, sen[t] the message that . . . poor judgment, or other factors, somehow render[ed] the conduct permissible or excusable.' "[44] This message and decision violate the public policy of the State of Washington. We recognize that a second chance may be warranted, but the policies of the WLAD require that an arbitration award be substantial enough to discourage repeat behavior. Because the arbitration award failed to provide an adequate sanction for the employee's conduct and did not allow the Port to fulfill its affirmative legal duty to provide a discrimination-free workplace, we vacate it.

¶23 The Union asserts that our Supreme Court's decision in *Kitsap County Deputy Sheriff's Guild v. Kitsap County*[45] requires a different result because the WLAD is not "a public policy prohibiting the remedy ordered by the arbitrator." The Union reads *Kitsap County Deputy Sheriff's Guild* too narrowly. There, Kitsap County terminated a deputy sheriff's employment for 29 documented incidents of misconduct, including dishonesty to his employer.[46] An arbitrator determined that termination was not the appropriate remedy, reinstated the deputy, and reduced his

---

[42] *Perry*, 123 Wn. App. at 803.

[43] *See AFSCME*, 747 A.2d at 486.

[44] *AFSCME*, 747 A.2d at 486.

[45] 167 Wn.2d 428, 219 P.3d 675 (2009).

[46] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 431.

penalty to three written warnings.[47] On appeal, the county argued that the arbitrator's award violated criminal statutes and the *Brady* rule,[48] which together prohibit public officers from knowingly making false statements and require prosecutors to disclose exculpatory evidence, including an officer's dishonesty.[49] The court held that those laws were inadequate to establish a public policy sufficient to vacate the award because they did not "prohibit[ ] the reinstatement of any officer found to violate these statutes."[50]

¶24 Under the Union's analysis, the legislature must mandate specific penalties for particular acts of discrimination before we can find that an arbitration award violates the WLAD. The Union's position virtually eliminates the public policy exception to judicial enforcement of an arbitration award. Neither the Washington Legislature nor Congress has acted to eliminate reviewing enforcement of arbitration awards for this purpose. We decline the Union's invitation to judicially adopt a rule requiring such a restrictive standard.

¶25 Notably, the *Kitsap County Deputy Sheriff's Guild* court offered examples of statutes from other jurisdictions that have qualified as explicit, well-defined, and dominant public policies in comparable cases. Citing *City of Brooklyn Center*, the court included "the affirmative duty under federal statute to prevent sexual harassment by law enforcement officers" in its list of explicit, well-defined, dominant public policies.[51] Accordingly, our Supreme Court distinguished statutes like the WLAD from those it considered in *Kitsap County Deputy Sheriff's Guild* and thus

---

[47] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 432-33.

[48] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (holding that a prosecutor's suppression of evidence violates due process where the evidence is material to guilt or punishment).

[49] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 436.

[50] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 436, 438.

[51] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 437.

suggested that the WLAD expresses the type of policy required for application of the public policy exception.[52]

¶26 In sum, the WLAD constitutes an explicit, well-defined, and dominant public policy, which creates an affirmative duty on the part of an employer to eradicate racial discrimination in the workplace. We do not attempt to define the outer limits of the enforceability of labor arbitration awards or adopt any requirement for a specific discipline for violation of the WLAD. "The judicially created public policy exception to labor arbitration awards is a fact-specific, contextually sensitive doctrine and therefore well suited to development through the common law mode of adjudication. Only in the light of concrete cases will the precise contours of the public policy exception become visible."[53] We hold that the arbitration award here violates Washington State public policy by preventing the Port from effectively discharging its duties under the WLAD. Accordingly, we vacate the arbitration award.

¶27 However, we also hold that the superior court exceeded the scope of its authority when it substituted its own determination of appropriate discipline for the arbitrator's. After vacating the arbitration award, the trial court imposed a six-month suspension, awarded back pay for the additional time Cann was off work, ordered Cann to write a sincere letter of apology that included a promise to never again engage in similar conduct, required that Cann attend diversity and antiharassment training, and placed Cann on a probationary status for four years, during which any of his conduct that violated the Port's antiharassment policy would result in his termination.

¶28 As explained by the United States Supreme Court, a reviewing court that vacates an arbitration award should not then make its own determination on the merits:

---

[52] *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 437 ("Washington has no similar statute . . . placing an affirmative duty on counties to prevent police officers from ever being untruthful.").

[53] *State v. Pub. Safety Emps. Ass'n*, 257 P.3d 151, 162 (Alaska 2011).

[A]s a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate.[54]

Considering the arbitration award is an extension of the parties' contract, the superior court here should have interfered to the least possible degree while upholding public policy. This limited interference could have been achieved by remanding the case for further arbitration. Accordingly, we affirm the trial court's decision to vacate but remand for further proceedings consistent with this opinion.

### Attorney Fees

¶29 The Union also claims that the superior court erred by partially denying its request for attorney fees under RCW 49.48.030. This court reviews the reasonableness of the amount of an award for an abuse of discretion.[55] "A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons."[56]

¶30 In the superior court, the Union requested $123,780 in attorney fees under RCW 49.48.030 for work performed by Dimitri Iglitzin, the Union's retained counsel, and Terry Roberts, the Union's in-house counsel. In support of its motion, the Union submitted Iglitzin's and Roberts's declarations. Iglitzin accompanied his declaration with time

---

[54] *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 n.10, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).

[55] *Hulbert v. Port of Everett*, 159 Wn. App. 389, 407, 245 P.3d 779 (2011), *review denied*, 171 Wn.2d 1024, 257 P.3d 662 (2011).

[56] *Hulbert*, 159 Wn. App. at 407.

records. Roberts's declaration, in contrast, contained only a statement of the total number of hours with no supporting documentation. According to Roberts, he

> [c]onservatively . . . spent one hundred and twenty eight hours of time working on the Arbitration aspects of this case and seventy three hours working on legal issues related to the vacation and confirmation of the Arbitrator's award. The fair value of my time is $350.00 per hour and I spent at least two hundred and one hours on this matter.

The superior court denied Roberts's fees. The court explained that the Union's request was not supported by adequate documentation:

> In-house counsel are entitled to reasonable fees if adequate documentation accompanies the request. The Union provides only an estimate of Terry Roberts' fees. The court is not able to evaluate the reasonableness of the fees given the quality of the information provided. Any calculation would be arbitrary. Therefore, the court has deducted $70,350 from the award representing Terry Roberts' fees.

¶31 RCW 49.48.030 provides for the award of reasonable attorney fees and costs for employees who prevail in a wage claim civil action. The attorney requesting fees has the burden of proving the reasonableness of the requested fees.[57] This attorney must provide reasonable documentation of the work performed,[58] including "contemporaneous records documenting the hours worked."[59] The "documentation need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work."[60]

---

[57] *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 151, 859 P.2d 1210 (1993).

[58] *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

[59] *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632 (1998).

[60] *Bowers*, 100 Wn.2d at 597.

¶32 Here, the superior court awarded attorney fees for Iglitzin's work but denied Roberts's attorney fees because it received only an estimate of the hours Roberts worked. Without contemporaneous time records documenting Roberts's hours, the superior court lacked the documentation required to make an adequate determination about the reasonableness of the fees requested. Therefore, the trial court did not abuse its discretion in denying part of the Union's request.

## CONCLUSION

¶33 We affirm the superior court's decision to vacate the arbitration award and to partially deny the Union's request for attorney fees. However, because the superior court should not have fashioned its own award, we remand for further proceedings consistent with this opinion.

Cox and SPEARMAN, JJ., concur.

Review granted at 173 Wn.2d 1026 (2012).