IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE,<br>SEATTLE POLICE DEPARTMENT,<br><br>           Respondent,<br><br>       v.<br><br>SEATTLE POLICE OFFICERS' GUILD,<br><br>         Appellant,<br><br>     and<br><br>ARBITRATOR JANE WILKINSON and<br>ADLEY SHEPHERD,<br><br>          Additional Parties. | No. 80467-7-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — This appeal arises from an arbitration panel's decision to reinstate former Seattle Police Department (SPD) officer Adley Shepherd, who was terminated by the City of Seattle for violating SPD's use-of-force policies. The panel, consisting of a three-member disciplinary review board (DRB), concluded that Shepherd violated SPD's policy restricting the use of force on handcuffed subjects when he punched a handcuffed woman in the face hard enough to cause an orbital fracture despite having had time to consider and execute other alternatives. The DRB also found that the policy Shepherd violated was clear and specific even though it was recently revised and that Shepherd had been adequately trained on the basics of the prior policy, which

Citations and pin cites are based on the Westlaw online version of the cited material.

was carried forward into the new policy and required officers to use only what force was reasonable, necessary, and proportional. And, the DRB acknowledged that the penalty should send a clear message that alternatives to the use of force on a handcuffed person should be utilized when circumstances permit.

Nevertheless, the DRB reinstated Shepherd with a 15-day suspension and duty modifications, finding that the seriousness of Shepherd's offense was mitigated by the fact that Shepherd used force "perhaps reflexively" after the woman kicked him two seconds earlier causing "stinging pain" and that Shepherd's "patience was being tried." The DRB also observed that Shepherd was insistent he did nothing wrong, and several of his co-workers agreed with him.

The DRB's decision reinstating Shepherd is so lenient it violates the explicit, well-defined, and dominant public policy against the excessive use of force in policing. Indeed, the DRB's decision sends a message to officers that a violation of a clear and specific policy is not that serious if the officer is dealing with a difficult subject, losing patience, or passionate in believing that he or she did nothing wrong—however mistaken that belief may be. Such a message cannot be squared with the public policy against the excessive use of force in policing, which we hold imposes on the City an affirmative duty to sufficiently discipline officers. Thus, the superior court did not err when it vacated the DRB's decision reinstating Shepherd. We affirm.

2

BACKGROUND

<u>The Underlying Incident; Shepherd's Termination</u>

"Courts do not review an arbitrator's factual determinations."  <u>Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle</u>, 176 Wn.2d 712, 716 n.1, 295 P.3d 736 (2013).  Accordingly, the following summary of the underlying incident is drawn from the DRB's written opinion.[1]

On June 22, 2014, Evelyn Shelby called 9-1-1 to report a potential domestic violence incident at her home.  The call concerned alleged threats against Shelby's son, Robert Shelby, made by Miyekko "Coco" Durden-Bosley, with whom Robert shared a daughter.[2]

Officer Adley Shepherd arrived at the Shelby residence at 2:15 a.m. and was later joined by Officers Mike Griffin and Rory Smith.  When Shepherd arrived, he encountered Robert on the sidewalk outside the Shelby residence and tried to interview him.  Robert was angry that Evelyn had called the police.  Shepherd asked Robert whether threats had been made, and Robert responded, " 'I hope not.  I don't know what she'd do.  I don't know what the fuck she's going to do.' "  But, Robert thought his mother was safe.

---

[1] The DRB's opinion does not have a dedicated "findings of fact" section. Accordingly, our summary relies on a section of the DRB's opinion in which it set forth "the undisputed sequence of events" and a later section in which the DRB set forth "certain facts that comprise the context of the incident at issue."  Our summary excludes, however, any hearing testimony recounted in those sections because it is unclear whether the DRB adopted that testimony as its factual findings.  <u>See</u> <u>State v. Coleman</u>, 6 Wn. App. 2d 507, 516 n.40, 431 P.3d 514 (2018) ("A finding that a particular witness testified, 'The stop light was red' is not the same as a finding of fact that the stop light was red.").

[2] Because Evelyn Shelby and her son share a last name, we refer to them by their first names for clarity.

Shepherd next went inside to speak with Evelyn while Griffin and Smith remained outside.  Evelyn reported that Robert had told her that Durden-Bosley had threatened to come over and fight Robert.  She indicated she was frightened and that there was a prior history of domestic violence between Durden-Bosley and Robert.

While Shepherd was speaking with Evelyn, an intoxicated Durden-Bosley (who apparently lived within walking distance of the Shelby home) arrived on foot.  She walked past Robert, who tried to avoid her.  Griffin asked her questions, but she refused to answer.

Shepherd went outside and asked Durden-Bosley questions.  While doing so, Shepherd remarked on Durden-Bosley's obvious inebriation, and Durden-Bosley became agitated and verbally confrontational.  Shepherd touched Durden-Bosley's right elbow to steer her toward his patrol car and away from Robert.  Durden-Bosley pulled away, objecting to being touched, and denied threatening anyone.  Her agitation grew and Robert told her to answer the questions.  After Shepherd told Durden-Bosley that she had frightened Evelyn, Robert interjected, " 'Nobody fucking threatened me, bro.' "  Shortly after, Durden-Bosley shouted at Evelyn, " 'Ms. Shelby, why are you scared?' "  This drew Robert's ire, and he said to Durden-Bosley, " 'Don't fucking ___ at my mom like that, bro.  You already called her a fucking bitch, dawg.' "  He then told her to " 'just handle shit cordially for once, man.' "  At the same time, Robert became antagonistic toward his mother for calling the police.

During these interchanges, Shepherd told the hyper-agitated Durden-

4

Bosley at least three times that she was " 'out of control.' " He also tried to persuade Robert to stop yelling. While Shepherd did so, Durden-Bosley interjected with personally insulting remarks to or about Shepherd. Finally, Shepherd exclaimed, " 'My patience is done. It's done. It's, it's over. So, somebody's going to go to jail. Who's it going to be?' " Durden-Bosley responded by exclaiming that no one touched anyone, but Shepherd told her she had threatened someone. After one more interchange, Shepherd told Durden-Bosley she was under arrest. With Griffin's assistance, Shepherd put Durden-Bosley into handcuffs and they escorted her toward the patrol car. Robert remained at an appropriate distance but interjected himself to strongly object to Durden-Bosley's arrest. For the next "minute or probably less," Durden-Bosley vehemently, vociferously, and repeatedly denied making a threat. She was generally uncooperative and resisted getting into the patrol car.

Shepherd was having issues controlling Durden-Bosley and, realizing he was slightly off balance, paused and stepped back momentarily. He noted that Griffin had opened the front passenger door, and he tried to guide Durden-Bosley into the car through the rear door. Shepherd thought Griffin was moving to the rear door on the other side of the car to assist, but Griffin stopped at the rear of the car. Shepherd had his hand on the top of Durden-Bosley's head and pushed her head down to get her into the patrol car. Durden-Bosley then spun around, fell or sat backward onto her back on the seat, brought up her right leg, and kicked Shepherd in the face with her Doc Marten brand boot, yelling, " 'Fuckin bitch!' " Durden-Bosley kicked Shepherd hard enough for him to feel pain and

5

exclaim, " 'she kicked me.' " Durden-Bosley then moved to a sitting position and placed her right foot on or near the ground outside of the patrol car. It is unclear where her left leg and foot were at this point.

After being kicked, Shepherd felt a little off balance and stepped back a bit. An in-car video shows that Shepherd's head, right arm and fist then entered the vehicle, with his arm delivering a blow that landed on Durden-Bosley's right eye. Approximately two seconds elapsed between the time that Durden-Bosley kicked Shepherd and the time that his blow landed on Durden-Bosley's eye.

Both Shepherd and Durden-Bosley were transported to Harborview for treatment. Durden-Bosley suffered a serious, but not permanent, injury to her right eye. The medical report described the injury as a " 'very small, minimally displaced orbital floor fracture (right) along the infraorbital canal and similarly minimally displaced medial wall fracture right eye.' " Meanwhile, Shepherd was diagnosed with "moderate, acute Temporomandibular Disorder (TMD) due to trauma." Shepherd called in sick the next day but returned to work the day after. Following investigations by multiple agencies and two Loudermill[3] hearings, then Seattle Chief of Police Kathleen O'Toole decided to terminate Shepherd.

<u>SPOG Challenge; Arbitration</u>

In November 2016, Shepherd's union, the Seattle Police Officers' Guild (SPOG), requested the DRB be convened so that Shepherd could challenge his

---

[3] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (holding that a public employee threatened with termination is entitled to a pre-termination hearing as "an initial check against mistaken decisions").

termination in accordance with the collective bargaining agreement (CBA) between SPOG and the City . The DRB, comprised of one representative for SPOG, one representative for the City, and an independent arbitrator (the neutral), held a five-day hearing in June 2018. The sole issue before the DRB, as stipulated by the parties, was "[w]hether the Chief's disciplinary decision was for just cause and in compliance with this Agreement and, if not, what the remedy should be?" Under the CBA, the DRB's decision would be "final and binding, and additional appeals . . . shall be foreclosed."

The DRB issued its written opinion and award on November 19, 2018.[4] It observed, with regard to just cause, that "the principle of just cause requires the City to prove that Shepherd violated its use of force rules, that the City respected labor principles of due process, which include a full and fair investigation, and that discharge was the appropriate penalty for the offense(s) proven." The DRB also observed that "[n]o material issue exists here regarding the thoroughness and fairness of the City's pre-discharge investigation." Accordingly, the only two questions before the DRB were "whether Officer Shepherd violated the City's use of force rules and if so, whether discharge was the appropriate remedy."

The DRB concluded that Shepherd had violated Section 8.100(2) of the

---

[4] The DRB's opinion appears to have been authored by the neutral, with the SPOG representative and the City representative each concurring in part and dissenting in part. The SPOG representative and the City representative did not specify the individual sections of the opinion from which they respectively dissented. But neither party claims that any section of the opinion received support from less than a majority of the DRB. Accordingly, we attribute all sections of the opinion to the DRB, including those sections where the context indicates the neutral was the "tie breaker."

City's use-of-force policy, which prohibits the use of physical force "[o]n handcuffed or otherwise restrained subjects except in exceptional circumstances when the subject's actions must be immediately stopped to prevent injury, escape, or destruction of property." The DRB observed that the two seconds that elapsed between the time Durden-Bosley kicked Shepherd and the time Shepherd landed a blow to Durden-Bosley's eye "gave Officer Shepherd a little time to reflect, though not a lot of time." It explained that in those two seconds, Shepherd could have considered and executed alternatives to the use of force:

> Officer Shepherd could have stepped back sufficiently to be able to maneuver the car door to partially shut on Ms. Durden-Bosley. He wouldn't have had to shut it all the way (since her legs were in the way) or use enough force to cause her injury. But he could have used it as a shield to protect himself and keep her from getting out. At this point, if she were still noncompliant, he could have asked another officer to pull her in from the other side or otherwise assist him. The [DRB] majority finds that Officer Shepherd had sufficient time to consider and execute this maneuver. This [DRB] majority also believes that retreating out of kicking distance from Ms. Durden-Bosley was another option. The majority agrees with the City that she wasn't much of a flight risk since she was handcuffed, intoxicated, and there were three officers and apparently a police dog at the scene. If Officer Shepherd had put a barrier or distance between himself and Ms. Durden-Bosley, she could not have assaulted him again. He could have engaged the other officers at the scene to work on subduing her without using undue force.

In concluding that Shepherd violated SPD policy, the DRB acknowledged that SPD had recently revised its use-of-force policy pursuant to a settlement agreement between the City and the United States (Consent Decree), which the City entered into after the U.S. Department of Justice (DOJ) filed suit against the City alleging a pattern and practice of unlawful use of force. Nevertheless, the DRB rejected SPOG's contention that Shepherd's training "was insufficient to

8

prepare [him] for what the City expected of him less than six months after the new rules were implemented." Specifically, the DRB noted "that the prior use of force policy, like the revised policy required officers to use only what force is reasonable, necessary and proportional" and that "Shepherd had been adequately trained on the basics of the prior policy, which was carried forward into the current policy." The DRB also explained that, despite some "unclear or conflicting signals the City gave its officers," particularly through training, "the message was clear from the City that alternatives to the use of physical force on a handcuffed person should be utilized when circumstances permit." The DRB observed that "[t]he written rule on use of force on handcuffed prisoners is clear [and] creates a targeted message regarding what force is permitted." It thus concluded that "the clarity and specificity of the policy regarding handcuffed subjects overrides any deficiencies in training" and was "unable to find that Officer Shepherd's conduct should be excused because his training was inadequate or conflicting."

The DRB turned next to whether termination was the appropriate penalty for Shepherd's misconduct and concluded it was not. The DRB wrote that "under CBAs, a neutral decision-maker may overturn an ultimate penalty that is unduly severe" and that "[t]he punishment must be proportional to the offense, must not be wholly out of line with the penalty meted in similar circumstances, must consider the offender's employment record, and must to the extent appropriate, reflect principles of progressive discipline."

Applying these standards, the DRB first discussed proportionality and

9

observed that although Shepherd had time to assess the situation and consider his options, "that amount of time was measurable in seconds, which isn't much." The DRB also considered, as mitigating circumstances, that Shepherd (1) "had been kicked in the face by a booted woman and felt stinging pain," (2) was not receiving any help from other officers to put Durden-Bosley in the patrol car, (3) used force "perhaps reflexively" and stopped once Durden-Bosley quit resisting, and (4) had unsuccessfully used de-escalation tactics, and "[h]is patience was being tried." According to the DRB, "[t]hese circumstances tend to mitigate somewhat the seriousness of Officer Shepherd's offense." The DRB also noted that although it concluded Shepherd violated department policy, "the question was a close one."

The DRB next discussed what it described as "disturbing" testimony regarding the training that Shepherd received. Specifically, "[SPOG] presented undisputed testimony from both Shepherd and [a] training officer . . . that an officer who is physically assaulted is trained to respond with sufficient force to subdue the subject, which is exactly what Officer Shepherd did here." According to the DRB, the training officer had testified,

> "I say the same thing to every class: 'If someone hits you, what are you supposed to do to protect yourself? If they hit you, what do you do?' The whole class will say, 'You hit them back.' Then I say to the class, 'How hard do we hit them?' The whole class will say, 'As hard as you can.' After I say that, I say, 'What do we do next? What do we do after we stop the threat?' I'm prompting them. They'll say, 'We modulate our force. We modulate our force to control it.' "

The DRB observed that when the training officer was asked whether he was ever told to stop this kind of training, he responded, " 'Never.' " It also observed that

the City "did not present evidence that cast doubt on the veracity of [the training officer]'s testimony that Officer Shepherd was trained to respond to an assault with the immediate use of measured force." The DRB acknowledged the City representative's observation that the training officer's testimony should apply "only to situations where the officer does not have two seconds to pursue other options." The DRB also wrote that it "would not excuse Officer Shepherd's blow to Ms. Durden-Bosley on the basis of training concerns." Nevertheless, the DRB found the training testimony to be a mitigating consideration.

The DRB next considered the penalty meted other officers. It noted that "the record contains several instances where officers received discipline, but were not discharged, for using unreasonable non-lethal force on a suspect" and that there were "no instances of record where the officer was discharged." The DRB noted that there were no prior or subsequent disciplinary situations exactly comparable to Shepherd's.

The DRB also addressed Shepherd's employment history. It noted that O'Toole "gave great weight to the fact that Shepherd received a 10-day suspension as the result of a policy violation in 2009." But the DRB considered the 2009 incident and Shepherd's interaction with Durden-Bosley "really . . . quite different matters."[5] It also observed that "Officer Shepherd readily admitted he

---

[5] The DRB described the 2009 incident as follows: "In that case, Officer Shepherd had responded to a domestic violence call from a man who was experiencing conflict with his male housemate. However, Officer Shepherd was not sure which of the two men was primarily responsible for the altercation between them, since they'd both participated in a physical altercation and appeared injured, although the caller appeared slightly more injured. SPD rules require[ ] officers on domestic violence assault calls to arrest the person primarily

11

had acted wrongly and was remorseful" over the 2009 incident, and Shepherd "has never been disciplined for anything except the 2009 . . . matter."

The DRB also noted that O'Toole "was very disturbed by Officer Shepherd's unwillingness to acknowledge that he made a mistake when he struck Ms. Durden-Bosley." The DRB considered O'Toole's view "troubling" because "Officer Shepherd was quite adamant he had done nothing wrong . . . [and] had several co-workers who agreed with him." The DRB explained that "[a]n employee arguably should not be unduly penalized for an honest, sincere and even reasonable, but mistaken belief that he or she had done nothing wrong." The DRB believed that "an honest, but mistaken belief that he was following SPD policy does not mean that Officer Shepherd is incapable of changing his behavior":

> There is no reason to believe that Officer Shepherd does not respect SPD policy, and it is quite possible, if not probable, that a lengthy suspension will tell him that he always has to think about and utilize options that involve the least amount of appropriate force under the circumstances. He also should be motivated by the fact that a subsequent offense involving the improper use of force could result in discharge.

The DRB additionally considered, as mitigating considerations, the length of Shepherd's employment with the City, "his record of performance as a good cop,"

---

responsible. Officer Shepherd arrested the housemate and took him to the precinct station. Nevertheless, he was concerned that he might have picked the wrong person. The housemate who called 911 did not want his roommate arrested and refused to give a statement or cooperate. Further, the arrestee was scheduled for surgery at 6:00 a.m. the next morning on an injured hand. After conferring with his sergeant and getting the sergeant's sign-off, Officer Shepherd released the arrestee. Tragically, that person went home and murdered his housemate, the one who had made the 911 call."

and a sergeant's testimony as to Shepherd's value to the City.

Finally, the DRB addressed an assertion by SPOG that Shepherd's termination was politically motivated. It noted that "perhaps discharging Officer Shepherd was intended to send a message . . . that [SPD] was taking its use of force policies seriously." But the DRB ultimately did not find that Shepherd's termination was improperly political.

Taking all of these considerations together, the DRB concluded that "the penalty of discharge for Officer Shepherd's offense, after taking into account the various mitigating considerations, was excessive [and] should be reduced to a significant suspension." The DRB acknowledged that its penalty should "send a message to the SPD's officers and to the public that the City takes its policies on the use of force and its implementation of modern policing practices very seriously." The DRB "underscore[d]" that its decision was "intended to send that message." Observing that a 30-day suspension was the maximum permitted under the CBA,[6] the DRB determined that a "15-day, *i.e.*, three working-week suspension (coupled with Officer Shepherd's removal from patrol and training duties . . . ), is sufficient to send that message." Accordingly, the DRB ordered Shepherd be reinstated with full back pay, less pay reflecting a 15-day unpaid suspension, and less interim earnings. It also gave the City the option to remove Shepherd from patrol and from conducting training on the use of force or defensive tactics.

---

[6] On appeal, SPOG cites Seattle Municipal Code 4.08.100 as the source of this 30-day maximum.

Proceedings in Superior Court

The City applied to the superior court for a writ directing the DRB to transmit its records and files to the court to determine whether to vacate the DRB's decision. The superior court granted the writ, and SPOG counterclaimed for breach of the CBA.

Later, the City successfully moved the superior court to vacate the DRB's decision, arguing that the DRB's reinstatement of Shepherd violated the "public policy against excessive use of force in policing." In its written ruling granting the City's motion to vacate, the court explained that there existed an explicit, dominant, and well-defined public policy against the excessive use of force in policing. In doing so, the court looked to the Fourth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, and 34 U.S.C. § 12601, which makes it "unlawful for any governmental authority . . . to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." The superior court also observed that provisions of the Consent Decree addressing the use of force against handcuffed individuals "support finding that the policy against the use of excessive force in policing is explicit, dominant and well-defined."

The superior court then concluded that the DRB's award was so lenient that it violated the public policy against excessive use of force in policing. The court acknowledged the DRB's finding that there was "no reason to believe that Officer Shepherd does not respect SPD policy," but it expressed concern "about

14

the impact a 15-day unpaid suspension with accompanying patrol and training responsibility losses will have in maintaining [SPD] compliance with the explicit, dominant and well-founded [*sic*] public policy against the use of excessive force in policing." The court also expressed concern about the mitigating factors considered by the DRB, specifically, "that Officer Shepherd's 'patience was being tried' and that he, 'feeling stinging pain' 'perhaps, reflexively, used force.'

SPOG appeals.

## STANDARD OF REVIEW

We review de novo a lower court's decision to vacate an arbitration award on public policy grounds. Kitsap County Deputy Sheriff's Guild v. Kitsap County, 167 Wn.2d 428, 434, 219 P.3d 675 (2009).

## DISCUSSION

### Whether the DRB's Decision Violated Public Policy

SPOG contends that the superior court erred by concluding that the DRB's decision violated public policy. We disagree.

"Courts will review an arbitration decision only in certain limited circumstances, such as when an arbitrator has exceeded his or her legal authority." Port of Seattle, 176 Wn.2d at 720. "To do otherwise would call into question the finality of arbitration decisions and undermine alternative dispute resolution." Id. Our Supreme Court has observed that " '[w]hen parties voluntarily submit to binding arbitration, they generally believe that they are trading their right to appeal an arbitration award for a relatively speedy and inexpensive resolution to their dispute.' " Id. at 720-21 (quoting Clark County

15

Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125, 150 Wn.2d 237, 247, 76 P.3d 248 (2003)). "Thus, a more extensive review of arbitration decisions 'would weaken the value of bargained for, binding arbitration and could damage the freedom of contract.' " Id. at 721 (quoting Kitsap County, 167 Wn.2d at 435).

"However, like any contract, an arbitration decision arising out of a collective bargaining agreement can be vacated if it violates public policy." Id. Specifically, "[t]he court treats the arbitration decision as if it were part of the contract, and such a decision will be vacated if it violates an " 'explicit, well defined, and dominant public policy, not simply general considerations of supposed public interests.' " Id. (internal quotation marks omitted) (quoting Kitsap County, 167 Wn.2d at 435). Washington courts have looked to federal decisions as persuasive in this context. See Kitsap County, 167 Wn.2d at 435.

Here, the parties disagree as to both (1) whether the DRB's decision implicates an explicit, dominant, and well-defined public policy and (2) if it does, whether the DRB's decision violates that policy. We address these issues in turn.

*A.  Existence of a Relevant Public Policy*

No Washington appellate court has addressed whether the laws that prohibit police use of excessive force set forth an explicit, well-defined, and dominant public policy. "Such a public policy . . . is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " W.R. Grace & Co. v. Local Union 759, Int'l Union

of the United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983) (quoting Muschany v. United States, 324 U.S. 49, 66, 65 S. Ct. 442, 89 L. Ed. 744 (1945)).

SPOG argues that, contrary to the superior court's determination, there exists no explicit, dominant, and well-defined public policy "that could be violated by an arbitration award reinstating an officer who violated a departmental use of force policy." The City, relying on the Fourth Amendment, 42 U.S.C. § 1983, 34 U.S.C. § 12601, and the Consent Decree, argues that there is a public policy against the use of excessive force in policing that is sufficiently explicit, dominant, and well defined to be implicated by the DRB's decision. We agree with the City.

The right to be free from excessive force—which finds its source in the Bill of Rights and is enforceable against states via the Fourteenth Amendment—is explicit. Indeed, the United States Supreme Court explicitly held in Graham v. Connor

> that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. *Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct*, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

490 U.S. 386, 395-96, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis added and omitted) (setting forth the general framework for "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment"); see also Shekleton v. Eichenberger, 677 F.3d 361, 367

17

(8th Cir. 2012) ("[T]he right to be free from excessive force dates back to the adoption of the Bill of Rights of our Constitution, as it is 'a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. . . .' " (internal quotation marks omitted) (quoting McGruder v. Heagwood, 197 F.3d 918, 919 (8th Cir. 1999))); Mapp v. Ohio, 367 U.S. 643, 650, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (recognizing that Fourth Amendment protections are enforceable against the states through the Fourteenth Amendment's due process clause); Staats v. Brown, 139 Wn.2d 757, 774, 991 P.2d 615 (2000) ("Use of excessive force to accomplish an arrest, even where supported by probable cause and/or a warrant, clearly violates the Fourth Amendment.").

The policy is also dominant. Not only is the right to be free from excessive force enshrined in the U.S. Constitution, which Washington's constitution recognizes as "the supreme law of the land," Const. art. 1, § 2, Congress has taken affirmative steps to ensure the right can be vindicated. For example, 42 U.S.C. § 1983, which provides a right of action to individuals whose constitutional rights were violated, "was enacted to create 'a broad remedy for violations of federally protected civil rights.' " United States v. County of Maricopa, 889 F.3d 648, 653 (9th Cir. 2018) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 685, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). And Congress, through 34 U.S.C. § 12601 (formerly codified at 42 U.S.C. § 14141), provided "a remedy for violations of federal civil rights, specifically for violations that are systematically perpetrated by local police departments." County of

18

Maricopa, 889 F.3d at 653.[7]  That Congress enacted these remedial measures shows that the policy against the use of excessive force in policing is a policy of highest priority.  See United States v. City of Columbus, No. CIV.A.2;99CV1097, 2000 WL 1133166 at *6 (S.D. Ohio Aug. 3, 2000) ("This Court has no doubt that, in enacting [§ 12601], Congress intended to respond, by both remedial and preventative measures, to a widespread pattern of violations of the Fourteenth Amendment by police officials acting under color of state law.").  Thus, the policy is dominant.  See Port of Seattle, 176 Wn.2d at 722 (holding that because the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, is a public policy of the highest priority, it is necessarily dominant).

Finally, the policy against the use of excessive force in policing is well defined.  In Port of Seattle, our Supreme Court concluded that the policy against workplace discrimination was well defined because "antidiscrimination laws create an affirmative duty for employers to prevent racial harassment . . . by sufficiently disciplining those who engage in harassing behavior."  176 Wn.2d at 722.  Similarly, 34 U.S.C. § 12601 imposes an affirmative duty on municipal employers to sufficiently discipline officers who violate use-of-force policies.

---

[7] The parties do not discuss the legislative history of § 12601.  But it is well understood that its text was originally proposed in direct response to national outcry over the Rodney King beating.  See Eugene Kim, Vindicating Civil Rights Under 42 U.S.C. § 14141: Guidance From Procedures in Complex Litigation, 29 HASTINGS CONST. L.Q. 767, 772-73 (2002); Marshall Miller, Police Brutality, 17 YALE L. & POL'Y REV. 149, 163 (1998).  It is also well understood that § 12601 "was intended to 'close [the] gap in the law' created by the modern equitable standing doctrine, which forecloses an individual from obtaining injunctive relief against police misconduct absent a likelihood of future harm to that particular plaintiff."  Kim, supra, at 769 (quoting United States v. City of Columbus, No. CIV.A.2;99CV1097, 2000 WL 1133166 at *9 (S.D. Ohio Aug. 3, 2000)).

Specifically, § 12601 makes it "unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."  34 U.S.C. § 12601(a).  It is axiomatic that, to comply with this legal duty to ensure that no pattern or practice exists, a municipal employer must sufficiently discipline officers who engage in conduct that could contribute to an unlawful pattern or practice.

The affirmative duty under § 12601 to impose sufficient discipline is further confirmed by the Consent Decree.  Under 34 U.S.C. § 12601(b), "Whenever the Attorney General has reasonable cause to believe that a violation of [subsection (a)] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice."  The Attorney General filed such a civil action against the City in July 2012 after the DOJ "released a report announcing that it had found reasonable cause, under . . . 34 U.S.C. § 12601 . . . , to believe that [SPD] had engaged in a pattern and practice of excessive force."  Order Finding City of Seattle Partially out of Compliance with Consent Decree, United States v. City of Seattle, No. C12-1282JLR, 2019 WL 2191871, at *1 (W.D. Wash. May 21, 2019) (Non-Compliance Order).  DOJ specifically found that SPD engaged in an unconstitutional pattern of "the use of excessive force on subjects who were already restrained."

The United States and the City settled the action via the Consent Decree,

20

which the U.S. District Court preliminary approved on September 21, 2012.  Non-Compliance Order, 2019 WL 2191871 at *1.  The City " 'entered into [the Consent Decree] with the goal of ensuring that the SPD's policies, procedures, training, and oversight are *sufficient to prevent* practices that the United States allege[d] contributed to a pattern and practice of constitutional violations.' "  Order to Show Cause whether the Court Should Find the City has Failed to Maintain Full and Effective Compliance with Consent Decree, United States v. City of Seattle, No. C12-1282JLR, 2018 WL 6304761, at *1 (W.D. Wash. Dec. 3, 2018) (Show Cause Order) (alterations and emphasis in original).  In preliminarily approving the Consent Decree, the U.S. District Court found that it " '[wa]s tailored to the alleged deficiencies identified by the United States' and '[wa]s *consistent with and furthers the objectives of [§ 12601]* because it embodies the agreement of the City and commitment of [the SPD] *to ensure that no pattern or practice of unconstitutional police conduct exists*.' "  Id. at *1 (fourth alteration in original; emphasis added).[8]

Under the Consent Decree, the City agreed that SPD's use-of-force policies should be guided by a number of principles, including that "[o]fficers normally should not use reportable force against handcuffed or otherwise restrained subjects unless necessary or reasonable under the circumstances to

---

[8] The quoted portions of the Show Cause Order quoted, in turn, from the U.S. District Court's findings of fact and conclusions of law, entered September 12, 2012, when the court preliminarily approved the Consent Decree.  A copy of the U.S. District Court's findings and conclusions are available on the DOJ's website at https://www.justice.gov/sites/default/files/crt/legacy/2014/10/10/spd_docket14_9-21-12.pdf [https://perma.cc/T3Y2-5QC3].

stop an assault, escape, or as necessary to fulfill other legitimate law enforcement objectives." SPD revised its use-of-force policies, including the policy on handcuffed suspects that Shepherd was later found to have violated, consistent with these principles. According to the Consent Decree, and as later confirmed by the DRB, "[t]he revised SPD policies *continued to reflect the constitutional use of force standard set out by the U.S. Supreme Court in* Graham v. Connor . . . and its progeny." (Emphasis added.)

The Consent Decree did not mandate specific changes to the City's discipline and accountability structures. Nevertheless, according to the U.S. District Court, the court was "responsible not only for ensuring that the City complies with all specific terms and conditions of the Consent Decree, but also that it does not do anything that—although not specifically mandated by the Consent Decree—*would undermine compliance with the document*." Id. (emphasis added). And in that court's view, "ensuring that appropriate oversight and accountability mechanisms are in place is one of the cornerstones to securing constitutional and effective policing in this City." Id. To that end, the U.S. District Court later concluded "that any provision that implicates officer discipline related to use-of-force inherently implicates . . . the Consent Decree's purposes, and thus, must be consistent with them." Non-Compliance Order, 2019 WL 2191871 at *3.[9]

---

[9] On May 21, 2019, the U.S. District Court held the City partially out of compliance with the Consent Decree—in large part because the City had, despite earlier acknowledging the inadequacy of its existing accountability regime, maintained the same regime that had allowed for Shepherd's reinstatement. Non-Compliance Order, 2019 WL 2191871 at *3, 5-6.

In short, municipal employers have a legal duty under § 12601 not to engage in patterns or practices of use of excessive force. That duty, by its nature, requires municipal employers to ensure that no pattern or practice of unconstitutional policing exists or will exist. As confirmed by the Consent Decree, effective accountability mechanisms, including accountability mechanisms that *sufficiently discipline* officers who violate the very policies designed to ensure constitutional policing, are a cornerstone of that duty. Thus, the public policy prohibiting police from using excessive force is well defined in addition to being explicit and dominant. Cf. Kitsap County, 167 Wn.2d at 437 (recognizing that an explicit, well-defined, and dominant public policy may stem from federal statutes that impose an affirmative duty to prevent misconduct by law enforcement officers); City of Boston v. Boston Police Patrolmen's Ass'n, 477 Mass. 434, 443, 78 N.E.3d 66 (2017) ("It is inarguable that well-defined public policy condemns excessive force by police officers.").

SPOG disagrees and contends that no well-defined policy exists because "there is no statute discussing the level of discipline required when a use of force policy is violated, let alone a statute prohibiting reinstatement in cases of excessive force." SPOG relies in part on Kitsap County, where our Supreme Court upheld an arbitration award reinstating a sheriff's deputy who had been terminated for 29 instances of misconduct, including untruthfulness. Kitsap County, 167 Wn.2d at 431, 433. There, the Supreme Court rejected the County's argument that there existed an explicit, dominant, and well-defined public policy prohibiting the deputy's reinstatement. Id. at 437. In doing so, it observed that

"Washington has no . . . statute prohibiting persons found to be untruthful from serving as officers *or placing an affirmative duty on counties to prevent police officers from ever being untruthful*." Id. (emphasis added).

Kitsap County is distinguishable. There, the court found no laws placing an affirmative duty on the county, but in the instant case, the relevant laws and legal precedents *do* place an affirmative duty on municipalities to prevent police officers from engaging in conduct that could contribute to a pattern or practice of unlawful behavior. Furthermore, our Supreme Court has rejected SPOG's argument that, for a public policy to be well defined, there must be a statute discussing the level of discipline required for policy violations. See Port of Seattle, 176 Wn.2d at 722-23.

Specifically, in Port of Seattle, our Supreme Court considered whether an award reinstating an employee who had hung a noose at work violated public policy. 176 Wn.2d at 720. The court held that WLAD expressed an explicit, dominant, and well-defined public policy against workplace harassment and discrimination. Id. at 723. In doing so, it rejected an argument from the employee's union that "the public policy expressed in WLAD is not explicit or well defined because specific penalties are not enumerated." Id. at 722. The court explained, "The idea of a statute attempting to list all possible discriminatory acts is fairly absurd in and of itself, but the idea of assigning specific disciplines without taking into account the surrounding circumstances is particularly inappropriate." Id. at 723. It continued, "Such a list could not reasonably be created, and thus requiring such a list would destroy the public policy exception."

24

Id. The same holds true with regard to the excessive use of force. SPOG's argument fails.

SPOG next suggests that, to affirm the superior court, this court would have to improperly "divine or create its own explicit public policy that might apply." SPOG then urges us to "refuse to divine a public policy that prohibits reinstatement or imposes disciplinary requirements that conflict with the [DRB]'s award." SPOG relies in part on Eastern Associated Coal Corp. v. United Mine Workers of America, Dist. 17, 531 U.S. 57, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000). According to SPOG, the U.S. Supreme Court in Eastern Associated "refused 'to infer a public policy' against reinstatement" where Congress had not created one. But as discussed, the public policy against excessive use of force in policing is rooted in the U.S. Constitution and defined by congressionally enacted statutes—we need not divine or create it.

Furthermore, SPOG's reliance on Eastern Associated is misplaced. The question in that case was whether an arbitration award that reinstated James Smith, a truck driver who twice tested positive for marijuana, violated public policy. Eastern Associated Coal Corp., 531 U.S. at 60-61. Smith's employer, who had sought to discharge him, argued that there existed an explicit, dominant, and well-defined policy "against reinstatement of workers who use drugs." Id. at 63.

The U.S. Supreme Court disagreed. Id. at 67. In doing so, the Court took specific note that, "[a]s a truck driver, Smith was subject to Department of Transportation (DOT) regulations requiring random drug testing of workers

25

engaged in 'safety-sensitive' tasks." Id. at 60 (quoting 49 C.F.R. §§ 382.301, 382.305 (1999)). It also noted that the field in which Smith worked was the subject of a detailed regulatory regime consisting of the Omnibus Employee Testing Act of 1991 (Act) and DOT's implementing regulations. Id. at 63. The Court stated, "[I]n a case like the one before us, where two political branches have created a *detailed regulatory regime in a specific field*, courts should approach with particular caution pleas to divine further public policy in that area." Id. (emphasis added).

In ultimately concluding that the regulatory regime did not express an explicit, dominant, and well-defined policy against reinstatement of workers who use drugs, the Court observed that "the Act's remedial aims are complex" and that the Act "says that 'rehabilitation is a critical component of any testing program.' " Id. at 64 (quoting Pub. L. 102-143 § 2(7)). Here, by contrast, SPOG points to no similarly careful and detailed regulatory regime, much less one that expressly prioritizes rehabilitation of officers who use excessive force. Accordingly, Eastern Associated is distinguishable and not persuasive.

SPOG next contends that "[a] general public policy against excessive force is not sufficiently explicit, well-defined, or dominant when weighed against countervailing policies within the Fourth Amendment." As evidence of these countervailing policies, SPOG points to RCW 9A.16.020(1), a provision of Washington's criminal code providing that "[t]he use . . . [of] force upon or toward the person of another is not unlawful . . . [w]henever necessarily used by a public officer in the performance of a legal duty." SPOG also points to the doctrine of

26

qualified immunity, which " 'shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' " Olivier v. Baca, 913 F.3d 852, 860 (9th Cir. 2019) (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).

SPOG's contention fails for three reasons. First, the existence of qualified immunity does not negate the existence of an explicit, dominant, and well-defined policy against the excessive use of force: Whether an individual officer should be held criminally or civilly liable for the use of force is an entirely different question than whether there exists an explicit, dominant, and well-defined policy condemning the use of excessive force in policing.

Second, SPOG's focus on qualified immunity and liability under § 1983 ignores § 12601, which was enacted to provide relief that § 1983, as interpreted by the courts, could not. City of Columbus, 2000 WL 1133166 at *7 ("[T]he grant of authority to the Attorney General reflected in . . . [§ 12601] was drafted in light of and was intended to remedy the inadequacies of 42 U.S.C. § 1983.").

Third and finally, RCW 9A.16.020(1), by its terms, applies only to force that is "necessarily used." Thus, that statute is not in conflict with a policy against the use of *excessive* force.

SPOG next argues that the policy against the use of excessive force in policing is not well defined because "§ 12601 does not create an affirmative duty that can be violated by a single arbitration award." SPOG argues,

27

A municipality's affirmative duty under § 12601 is to refrain from engaging in a pattern or practice of conduct that violates constitutional rights. *Nothing in the statute or case law could lead to the conclusion that an affirmative duty exists that could be violated by a single disciplinary decision or even a single arbitration award.* Therefore, any affirmative duty or public policy is not sufficiently "well-defined" for the public policy exception, because *no arbitration decision can violate that affirmative duty.* Courts would be left with insufficient guidance for determining when an award would violate the public policy.

(Emphasis added.)

But SPOG's argument fails to acknowledge that a pattern or practice results when individual instances of misconduct are repeated. Cf. Equal Emp't Opportunity Comm'n v. Bass Pro Outdoor World, L.L.C., 826 F.3d 791, 797 (5th Cir. 2016) (explaining, in the employment discrimination context, that plaintiff may show a pattern or practice by showing that denial of rights was repeated, routine, or of a generalized nature). Thus, as discussed, a duty to refrain from engaging in a pattern or practice necessarily includes a duty to take affirmative steps to prevent the individual instances of misconduct that contribute to an unlawful pattern or practice. Each arbitration award arising out of a disciplinary decision undertaken to carry out this duty will by its nature be a single award. Thus, we find unpersuasive SPOG's argument that no such award could ever violate public policy. Additionally, SPOG's argument does not acknowledge the Consent Decree, which confirms the City's affirmative duty under § 12601. Cf. United States v. Puerto Rico, 460 F. Supp. 3d 159, 160 (D.P.R. 2020) (noting that the "*raison dêtre*" of a consent decree entered pursuant to § 12601 was "to guarantee constitutionally acceptable police practices within the Commonwealth, the ultimate beneficiary being the citizenry itself"). SPOG's argument fails.

28

Finally, SPOG argues that because the Consent Decree is not a law or legal precedent, the court may not look to it as evidence of a public policy, citing W.R. Grace and Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, International Association of Machinists and Aerospace Workers, 886 F.2d 1200 (9th Cir. 1989) (plurality opinion). But we do not look to the Consent Decree as the source of public policy—rather, the Consent Decree confirms the explicit, dominant, and well-defined policy set forth by the Fourth Amendment, § 1983, and § 12601. Cf. Frew ex. rel. Frew v. Hawkins, 540 U.S. 431, 437, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) (observing that consent decrees entered in federal court "must further the objectives of the law upon which the complaint was based.").

Furthermore, SPOG's reliance on W.R. Grace and Stead Motors is misplaced. In Stead Motors, the plurality expressly left open the possibility that "specific action by a regulatory or other administrative agency might provide some form of ad hoc 'legal precedent' . . . sufficient to justify invalidation of an award on public policy grounds." 886 F.2d at 1215. The plurality acknowledged, without deciding, that action by a federal agency—such as, here, the DOJ— "might reasonably be construed as an 'explicit, well defined and dominant' expression of a public policy as applied to the facts of the case." Id. at 1215 & n.15. And in W.R. Grace, the Court did not, as SPOG claims, "reject[ ] reliance on a consent decree for a public policy." The question in W.R. Grace was whether an arbitrator's award violated the public policy requiring obedience to court orders, such as an order mandating compliance with a conciliation

29

agreement—not whether the conciliation agreement itself was a source of public policy. 461 U.S. at 766.

Additionally, Stead Motors and W.R. Grace are distinguishable from the instant case because neither case analyzed whether the prohibition on the use of excessive force is an explicit, well-defined, and dominant public policy. They also are distinguishable because both cases involved private sector employees. Although the City does not ask us to draw a distinction between public and private employment, at least one state supreme court has observed that the distinction matters, albeit in the context of deciding whether a public policy was violated (and not whether it existed in the first place):

> Nationally, in the vast majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee, primarily working in fields such as law enforcement, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people. In most private sector disputes, by contrast, the law presumes that the parties have secured their own interests through their contractual arrangements, . . . and that the customers or clients whom they serve may vote with their feet and protect their own interests should they deem the conduct of an employee to be unacceptable.

Burr Road Operating Co. II, LLC v. New England Health Care Emps. Union, Dist. 1199, 316 Conn. 618, 635, 114 A.3d 144 (2015) (citations omitted).

In summary, we conclude that the prohibition of the excessive use of force in policing is an explicit, well-defined, and dominant public policy.

*B. Whether the DRB's Decision Violates Public Policy*

SPOG contends that even if there is an explicit, dominant, and well-defined public policy against the use of excessive force in policing, the superior court erred by concluding that the DRB's decision violated that policy. We disagree.

In evaluating whether an arbitrator's decision violates public policy, we treat the decision as if it were part of the CBA. Kitsap County, 167 Wn.2d at 435 (citing Eastern Associated Coal Corp., 531 U.S. at 62). This is because, "[u]nlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the [CBA] is a skeletal, interstitial document." Stead Motors, 886 F.2d at 1205. "The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain." Id. That is, the labor arbitrator " 'is speaking for the parties, and his award *is* their contract.' " Id. (quoting Theodore J. St. Antoine, Judicial Review of Labor Arbitration Awards: A Second Look at *Enterprise Wheel* and Its Progeny, 75 MICH. L. REV. 1137, 1140 (1977)). "Thus, what courts do when they review an arbitrator's award is more akin to the review of a contract than of the decision of an inferior tribunal: the award, just as a contract, is the expression of the parties' will and must be enforced as expressed unless illegal or void." Id. at 1205-06. And " '[a]s with any contract . . . a court may not enforce a [CBA] that is contrary to public policy.' " Id. at 1210 (third alteration added) (quoting W.R. Grace, 461 U.S. at 766). Here, we conclude that the CBA, as interpreted by the DRB's decision, is

contrary to public policy.

Port of Seattle is instructive. As discussed, the Port of Seattle court concluded that there existed a policy against workplace discrimination requiring employers to sufficiently discipline harassers. 176 Wn.2d at 722. After reaching that conclusion, the court considered whether the arbitrator's award reinstating and imposing a 20-day suspension on an employee who hung a noose at work violated that policy. Id. at 723. The court observed that in light of the public policy at issue and the affirmative duty reflected therein, it would "vacate an arbitration award that does not impose sufficient discipline to end current discrimination and prevent future discrimination." Id.

The court ultimately concluded that the arbitrator's award did not violate public policy. Id. at 724. In doing so, the court took note that "[h]istorically, the noose has been used as a hateful expression of violence and hostility toward African-Americans—not just symbolically, but in actual horrific acts of murder." Id. at 723. It "acknowledge[d] this terrible and tragic history and condemn[ed] the racial violence and threats of violence symbolized by the noose in the strongest terms possible." Id.

The court also acknowledged, however, that it was "bound by the arbitrator's findings of fact," including that the employee, Mark Cann, intended the noose as a " 'prank' " on a 70-year-old, white co-worker, Cann was unaware of the hateful history of the noose, which he associated with " 'Cowboys and Indians,' " his actions "were 'more clueless than racist,' " the African-American employee who reported the noose did not find the display harassing or criminal,

and Cann had a 12-year employment history with the Port with no performance problems. Id. at 719, 723-24. The court concluded that, under the circumstances of the case as found by the arbitrator, "we cannot say that a 20-day unpaid suspension would not provide sufficient discipline to cause this or other employees to understand the serious nature of a noose in the workplace and thus prevent a similar incident in the future." Id. at 724. In other words, the Port of Seattle court concluded that the specific circumstances of the case, as found by the arbitrator, were properly considered as mitigating and necessitated a conclusion that the arbitrator's award was not too lenient in light of the public policy at issue.

In the instant case, by contrast, some of the circumstances the DRB considered as mitigating were not properly considered as mitigating, and the circumstances of Shepherd's case, as found by the DRB, necessitate a conclusion that the DRB's award was so lenient as to violate the public policy against the use of excessive force.

Specifically, the DRB considered the following circumstances as mitigating factors: (1) that Shepherd acted "perhaps reflexively" after being kicked; (2) that "[h]is patience was being tried, and (3) that he sincerely believed that he did nothing wrong. The DRB reasoned that "[t]hese circumstances tend to mitigate somewhat the seriousness of Shepherd's offense," and "[a]n employee arguably should not be unduly penalized for an honest, sincere and even reasonable, but mistaken belief that he or she had done nothing wrong." These circumstances were not properly considered as mitigating for three reasons.

First, the DRB noted that while "Shepherd had time to assess the situation and consider his options, that amount of time was measureable in seconds, which isn't much," and thus, he "perhaps reflexively, used force." But the DRB's finding that Shepherd had only seconds to consider his options was based on its finding that only two seconds elapsed between the time Durden-Bosley kicked him and the time that Shepherd's punch landed on Durden-Bosley's eye.[10] In other words, the DRB reasoned that Shepherd had only two seconds to consider his options *because that is how long it actually took him to punch Durden-Bosley*.

This circular reasoning is untenable, particularly in light of the public policy against the use of excessive force. That policy is, as discussed, rooted in the Fourth Amendment, which does incorporate a standard of objective reasonableness to "allow[ ] for the fact that police officers are often *forced* to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97 (emphasis added). But Shepherd was not "forced" to make a split-second decision. Rather, according to the DRB's own findings, Shepherd was the one who created the two-second window by punching Durden-Bosley within that time frame despite the fact that Durden-

---

[10] The DRB found that "[f]rom the in-car videos and forensic analysis, it appears that approximately two seconds elapsed between the time Ms. Durden-Bosley kicked Officer Shepherd in his face and the time he punched her in the eye." The DRB then observed that although SPD's use-of-force policy required the assessment of reasonableness to allow "for the fact that police officers are often forced to make split-second decisions," the two seconds that elapsed between the time Durden-Bosley kicked Shepherd and the time his punch landed on her eye "gave Officer Shepherd a little time to reflect, though not a lot of time."

Bosley "wasn't much of a flight risk since she was handcuffed, intoxicated, and there were three officers and apparently a police dog at the scene," Shepherd could have put a barrier between himself and Durden-Bosley so she could not have assaulted him again, and "he could have engaged the other officers at the scene to work on subduing her without using undue force." Under these circumstances, suggesting that Shepherd's "perhaps reflexive[ ]" use of force is a mitigating factor is tantamount to excusing officers who act before they think.

Second, a finding that the officer's patience was being tried would not be surprising or unexpected in any case where an officer has been found to have used excessive force. In the instant case, Shepherd responded to a circumstance that is not all that unique for officers: angry and/or intoxicated people, uncertainty on what, if anything occurred, and insults being lobbed at officers. It is not surprising that an officer's patience may be tried under these circumstances. Nevertheless, as the superior court correctly concluded, to consider this as a mitigating factor in the context of the excessive use of force would be "to condone the use of force when dealing with difficult subjects when it is universally understood that a significant part of the job of the patrol officer is dealing with difficult subjects and doing so with patience."

Third, the DRB considered Shepherd's subjective belief that he did nothing wrong, and it observed that Shepherd had several co-workers who agreed with him. But consideration of these factors as mitigating telegraphs to officers that a violation of a clear and specific policy will be condoned if the officer is passionate enough that no violation occurred and enough colleagues agree

35

with him, however, mistaken they may be.  Indeed, even under Fourth Amendment standards, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; *nor will an officer's good intentions make an objectively unreasonable use of force constitutional.*"  Graham, 490 U.S. at 397 (emphasis added).

In short, in determining its award, the DRB considered a number of mitigating factors that were not properly considered as mitigating in light of the public policy against the use of excessive force.

Furthermore, and as a result, based on the specific circumstances of Shepherd's case as found by the DRB, the DRB's award reinstating Shepherd was so lenient it violates the public policy against the use of excessive force.

Specifically, the DRB found that "the message was clear from the City that alternatives to the use of physical force on a handcuffed person should be utilized when circumstances permit," and "[t]he written rule on use of force on handcuffed prisoners is clear."  The DRB also found that Shepherd was adequately trained on SPD's prior policy, "which was carried forward into the current policy," and that "the clarity and specificity of the policy regarding handcuffed subjects overrides any deficiencies in training."

Yet the DRB also found that despite Shepherd's adequate training and the clarity and specificity of SPD's policies, he punched a woman who, although angry and resistant, was "not a large person" and was handcuffed and intoxicated.  The DRB also found that although Shepherd described Durden-Bosley as "amazingly strong," Shepherd himself was "relatively large and

physically strong" with a "physique that would befit the former football player and combat veteran that he was." And, the DRB found that Durden-Bosley was the only person arrested, and there were two additional officers, including a K-9 officer, at the scene. Thus, the DRB found, Durden-Bosley was not much of a flight risk. Additionally, as discussed, the DRB found that after Durden-Bosley kicked Shepherd, he had time to consider and execute multiple maneuvers other than the use of force he ultimately chose.

Furthermore, even under Fourth Amendment standards, judging the reasonableness of an officer's use of force "requires careful attention to the facts and circumstances . . . , including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Yet here, although the DRB did not indicate in its findings why Durden-Bosley was arrested, there is no indication that she was arrested for a crime that would have justified a particular use of force, or that she posed an immediate threat to the safety of officers or others at the scene. Rather, in its summary of the evidence, which was undisputed, the DRB found that Shepherd responded to a possible domestic violence incident, that Evelyn reported that Robert told her that Durden-Bosley threatened to come over and fight Robert, and that Robert denied being threatened. The DRB also found that during Shepherd's investigation, he remarked on Durden-Bosley's obvious state of inebriation, that she then became agitated and verbally confrontational, that she denied threatening anyone; that she did not want Shepherd touching her;

and that she made personally insulting remarks to or about Shepherd. The DRB found that prior to arresting Durden-Bosley, Shepherd said "My patience is done. It's done. It's, it's over. So, somebody's going to jail. Who's it going to be?" The DRB found that Shepherd told Durden-Bosley that she had "threatened someone" and that she was under arrest. In other words, although the DRB found that Durden-Bosley was intoxicated, agitated, and verbally confrontational, nothing in the DRB's findings about the lead-up to the arrest indicate that Durden-Bosley posed an immediate threat or was arrested for anything other than "threatening someone."

In short, the DRB reinstated an officer who—despite being adequately trained on SPD's clear and specific policies regarding the use of force—violated those policies by punching a handcuffed, intoxicated, subject even though she was not much of a flight risk and other alternatives were available to him, and who then adamantly denied doing anything wrong. The DRB did so by considering, as mitigating, circumstances that were not properly considered as mitigating in the context of the public policy against the use of excessive force, and without making any other findings that would properly have been considered mitigating with regard to Shepherd's decision to punch Durden-Bosley. Under these circumstances, which are based on the DRB's own findings, the DRB's decision to reinstate Shepherd runs directly counter to the policy requiring the City to impose sufficient discipline to deter future instances of misconduct. For these reasons, the superior court did not err by vacating the DRB's decision on public policy grounds.

SPOG disagrees and contends that in vacating the DRB's award, the superior court "improperly substituted [its] own judgment for that of the arbitration panel and relitigated the issue of the appropriate penalty."[11]  SPOG relies on the following passage from Port of Seattle: " '[J]udgments about how a specific employee will perform after reinstatement if given a lesser sanction are nothing more than an exercise of the arbitrator's broad authority to determine appropriate punishments and remedies.' "  176 Wn.2d at 723 (quoting Stead Motors, 886 F.2d at 1213).

But that passage cannot be read in a vacuum.  The Port of Seattle court did acknowledge the general principle that judgments about a penalty's effect on a *specific* employee are properly left to the arbitrator.  Id.  But it did so in the course of explaining that, nevertheless, "when an arbitrator's punishment is so lenient that it will not deter *future discrimination—including discrimination committed by others*—it must be vacated."  Id. (emphasis added).

Put another way, the arbitrator decides, in the first instance as a matter of CBA interpretation, the correct penalty vis-à-vis the offending employee.  "By contrast, in deciding whether to vacate an arbitral award because it conflicts with public policy, a court 'is actually concerned with the *lawfulness of its enforcing* the award and not with the *correctness of the arbitrator's* decision.' "  Stead

---

[11] SPOG also contends that, in vacating the DRB's decision, the superior court erred by repeatedly viewing a video of the underlying incident and substituting its own findings for those of the DRB.  But the video was part of the DRB's certified record, and SPOG cites no authority that restricts the number of times the superior court can review the record.  Additionally, the superior court explicitly stated that it accepted the DRB's finding of fact.

<u>Motors</u>, 886 F.2d at 1227 (Wallace, J., concurring and dissenting in part) (quoting <u>Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. Local 985 v. W.M. Chace Co.</u>, 262 F. Supp. 114, 117 (E.D. Mich. 1966)). Thus, "a court, in considering whether to vacate an award for public policy reasons, is not reconsidering a decision already made by the arbitrator—that is, is not substituting its judgment for the arbitrator's on an issue on which the parties bargained for the arbitrator's judgment." <u>Id.</u> Instead, while the arbitrator applies the "law of the shop," the court applies the "law of the land." <u>See</u> <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 57, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) (explaining that arbitrator's task "is to effectuate the intent of the parties rather than the requirements of enacted legislation"). SPOG's argument that the superior court substituted its judgment for the arbitrator's misses the distinction between the arbitrator's role and the court's role and, thus, is unpersuasive. <u>Cf.</u> <u>W.R. Grace</u>, 461 U.S. at 766 ("[T]he question of public policy is ultimately one for resolution by the courts.").

For similar reasons, SPOG's suggestion that the DRB's reasoning is sacrosanct, even with regard to what the DRB considered as mitigating factors, also fails. Specifically, SPOG argues in its reply brief that this court "cannot . . . impose its own judgment that a cited mitigating factor is actually an exacerbating factor." Relying in part on <u>Int'l Brotherhood of Electrical Workers, Local 97 v. Niagara Mohawk Power Corp.</u>, No. 97-7113, 1998 WL 253755 (2d Cir. May 8, 1998), SPOG contends that courts may not question an arbitrator's reasoning. But this argument again misses the distinction between the arbitrator's role and

the court's. Furthermore, Niagara Mohawk is distinguishable because it involved the nuclear safety industry, which was the subject of detailed regulations that reflected a "favorable attitude . . . toward rehabilitation and reinstatement." 1998 WL 253755 at *15. And as discussed above with regard to Eastern Associated Coal, SPOG does not point to any similarly detailed regulatory scheme that applies here. Moreover, even SPOG acknowledges that when the public policy at issue mandates deterrence, the court must necessarily conduct "some analysis of the seriousness of the misconduct, as found by the arbitrator, to determine whether the discipline conflicted with the employer's affirmative duty to impose sufficient discipline."

SPOG next asserts, "Here, no tribunal has found that Officer Shepherd's use of force fell below Fourth Amendment standards, so a court cannot find that enforcement of this award would violate a public policy stemming from the Fourth Amendment." SPOG also asserts that the City intended for its revised use-of-force policy "to be more restrictive than the constitutional floor" and "work rules do not create the standard by which courts judge whether an award violates Washington public policy." (bold omitted). But SPOG does not dispute that, as the DRB concluded, "[t]he revised SPD policies continued to reflect the constitutional use of force standard set out by the U.S. Supreme Court in Graham." Furthermore, as demonstrated by Port of Seattle, when the public policy at issue requires the employer to deter future instances of misconduct, the question is not whether the offending employee's conduct actually violated the law—but whether the arbitrator's award is so lenient that it will not deter future

violations, including by others. See Port of Seattle, 176 Wn.2d at 724 (declining to address whether employee's conduct actually violated antidiscrimination laws, "which would be analyzed under a very different legal framework"). We thus reject SPOG's suggestion that, where the relevant public policy calls for deterrence, an arbitral award cannot violate that policy unless a tribunal determines that the offending employee actually behaved unlawfully.[12] Cf. id. at 716 ("We review only the arbitrator's award and not the underlying conduct.").

SPOG next contends that "it would be an error of law to hold that a 15-day unpaid suspension and modification of work duties was insufficient to deter other employees." It also contends that the DRB's award "did not lead to increased uses of force; rather, the City maintained its trend of reducing the use of force by its officers." In support of this contention, SPOG points to the SPD's annual report on the use of force, which SPOG attached as an appendix to its reply brief.

Under RAP 10.3(a)(8), "[a]n appendix may not include materials not contained in the record on review without permission from the appellate court," and SPOG does not address the six requirements of RAP 9.11(a) for supplementing the record. Therefore, we decline to consider the appendix.

Furthermore, and in any event, in affirming the superior court, we do not

---

[12] An officer's use of force might never be judicially tested against Fourth Amendment standards for a number of reasons. For example, a prosecutor might choose to dismiss charges against a suspect over concerns about the arresting officer's use of force. And targets of officers' use of excessive force might choose not to pursue civil action or, if they do, might negotiate settlement. Indeed, here, no charges were filed against Durden-Bosley, and the City represents that it settled Durden-Bosley's § 1983 lawsuit against Shepherd and the City.

hold that a 15-day suspension with a modification of work duties is, as a matter of law, insufficient to deter future uses of excessive force. Rather, we hold that the DRB's decision to reinstate Shepherd is insufficient *under the circumstances of this case, as found by the DRB*. We need not speculate whether the DRB's decision would be insufficient in *any* case where an officer is found to have violated SPD's use-of-force policy. For these reasons, SPOG's assertions are unpersuasive.

Vacatur vs. Remand

SPOG contends that even if the superior court properly concluded that the DRB's decision violated public policy, the court erred by vacating that decision rather than remanding to the DRB for further arbitration. The City responds that because the superior court did not impose its own remedy, its decision to simply vacate the DRB's decision was proper. We agree with the City.

SPOG relies on Port of Seattle to argue that remand was required. There, the superior court not only vacated the arbitrator's award, but fashioned its own remedy, including a six-month suspension, a letter of apology, participation in anti-harassment training, and immediate termination should the employee violate the Port's anti-harassment policy during the four years following his reinstatement. Port of Seattle, 176 Wn.2d at 719-20. On appeal, we reversed the remedy portion of the superior court's ruling. Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle, 164 Wn. App. 307, 324, 264 P.3d 268 (2011). We explained that when vacating an arbitration award, a court should "interfere[ ] to the least possible degree while upholding public policy," relying on the following

guiding principles set out by the United States Supreme Court in United

Paperworkers International Union v. Misco, Inc.:

> "[A]s a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the [CBA].  Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement.  The court also has the authority to remand for further proceedings when this step seems appropriate."

Port of Seattle, 164 Wn. App. at 323-24 (first alteration in original) (quoting

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 40 n.10, 108 S. Ct.

364, 98 L. Ed. 2d 286 (1987)).  On further review, our Supreme Court confirmed

"that a trial court vacating an arbitration decision cannot impose its own remedy;

*instead it should remand to the arbitrator for further proceedings*."  Port of

Seattle, 176 Wn.2d at 726 (emphasis added).  However, the Supreme Court in

Port of Seattle ultimately held that the arbitration award should not have been

vacated because reinstating the employee, under the circumstances of that case,

did not violate public policy.

Accordingly, as we did in Port of Seattle, we look to the principles set forth

by the U.S. Supreme Court in Misco, i.e., that when vacating an arbitrator's

award, the court should interfere "to the least possible degree," leave open the

possibility of further proceedings if permitted under the terms of the CBA, and

" 'remand for further proceedings *when this step seems appropriate*.' "  164 Wn.

App. at 324 (emphasis added) (quoting Misco, 484 U.S. at 40 n.10).

We conclude that remand is not appropriate here.  As discussed,

44

reinstatement under the circumstances of this case would send a message that it is not that serious when an officer, who has time to execute other options, violates a clear and specific policy on which he was adequately trained by using excessive force on a handcuffed subject "perhaps reflexively" because "[h]is patience was being tried," causes serious injury, and insists he did nothing wrong. Therefore, where the City decided on termination, remanding to the DRB to reinstate Shepherd subject to some other penalty would thwart the City's ability to ensure that no pattern or practice of using excessive force exists— especially given SPOG's representation that the maximum allowable suspension would be 30 days.[13] For these reasons, we conclude that the public policy against the use of excessive force in policing bars reinstatement under the facts of this case, and thus, the superior court did not err by simply vacating the DRB's decision. Cf. Eastern Associated Coal Corp., 531 U.S. at 62-63 ("[T]he question to be answered is not whether [the employee's conduct] itself violate[d] public policy, but whether the agreement to reinstate him does so.").

SPOG's Counterclaims

As a final matter, SPOG contends that the superior court erred "by failing to grant" SPOG's counterclaim for breach of contract. SPOG asserts that there is "no dispute that the City has not complied with any part of the order in the arbitration award," and "failing to comply with an arbitration award is a breach of

---

[13] See Seattle Municipal Code § 4.08.100. The CBA also provides, "On indefinite suspensions used for investigative purposes which do not result in termination of employment or reduction in rank, the resultant punishment shall not exceed thirty (30) days including the investigative time incorporated within the indefinite suspension."

45

the underlying [CBA]." Because the superior court did not err in vacating the DRB's decision on public policy grounds, it also did not err by not enforcing the decision or ordering the City to comply with it.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____       _____
Chun, J.                                Dwyer, J.